UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert O'KEEFE, John Edwin Montgomery, Jr., Defendants-Appellants.

UNITED STATES of America,
Plaintiff-Appellant,

v.

John MONTGOMERY, and Robert T. O'Keefe, Defendants-Appellees.

Nos. 86–5068, 86–5136.

United States Court of Appeals,
Eleventh Circuit.

Aug. 21, 1987.

Leon B. Kellner, U.S. Atty., Linda Collins-Hertz, Lawrence H. Sharf, Sonia Escobio O'Donnell and Nancy L. Worthington, Asst. U.S. Attys., Miami, Fla., for the U.S.

Bruce A. Zimet, P.A., Ft. Lauderdale, Fla., for Robert O'Keefe.

Kenneth W. Lipman, Siegel & Lipman, Boca Raton, Fla., for Montgomery.

Before RONEY, Chief Judge, VANCE, Circuit Judge, and PITTMAN *, Senior District Judge.

\* Honorable Virgil Pittman, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation.

PITTMAN, Senior District Judge:

All parties to this criminal prosecution appeal portions of the judgment adverse to them. For the reasons discussed below, we AFFIRM all aspects of the district court's judgment.

*Facts and Proceedings Below*

Defendants Montgomery and O'Keefe were charged in a multi-count indictment with violations of the tax code, the Hobbs Act, and the Travel Act for event occurring in connection with the construction of a nursing home in Sunrise, Florida.

The defendants were charged with filing false tax returns for the years 1981 and 1982. Specifically, they were charged with failing to fully disclose their gross business receipts for those years. O'Keefe's unreported income was money withdrawn by him from Nob Hill Realty accounts. Montgomery's unreported income in 1981 consisted of checks written to him from Nob Hill accounts; for 1982, some unreported income came from Nob Hill Realty, but the greatest portion consisted of a $32,500.00 consulting fee paid to B & J Associates.

The defendants' primary defense to the tax charges was that the unreported income consisted of loans to and from Nob Hill Realty and B & J Associates. Alternatively, they maintained that they were sloppy bookkeepers and any discrepancy between their income and the returns was the result of negligence, not willfulness. Montgomery also maintained that he relied on O'Keefe to accurately report his Nob Hill income to their tax preparer. To the extortion charges, the defendants assert that the money they received was reasonable compensation for legitimate services rendered.

Montgomery, a member of the Sunrise City Council, and O'Keefe, a member and later chairman of the Planning and Zoning Board of the City of Sunrise, were charged with having participated in a scheme to demand, under color of official right and by

inducing fear of economic loss, $70,000.00 and other things of value in return for the passage of various resolutions and authorizations by the Sunrise City Council and in exchange for a special use exemption to construct the nursing home in the City of Sunrise. The Travel Act charge relied on Florida's unlawful compensation statute as the predicate act.

William McKettrick and Thomas Allgood, who had been partners in nursing home projects in Georgia, decided to erect a nursing home in Broward County, Florida, through a company they formed, Richmond Health Care (Richmond). In May, 1981, a realtor introduced McKettrick to defendants Montgomery and O'Keefe, who were partners in Nob Hill Realty of Sunrise, Inc. Montgomery located a suitable site for the nursing home within Sunrise and an option contract was signed with the property's owner. Montgomery and O'Keefe ultimately received a sales commission of $36,900.00 from this transaction. The real estate commission was not charged in the indictment.

The State of Florida must approve all nursing home applications by issuing a "certificate of need," after a local advisory board holds hearings and makes recommendations. Montgomery lobbied the state, which later issued the certificate on September 29, 1981. The certificate would expire unless construction was commenced within one year.

Due to high interest rates then prevailing, it soon became apparent that conventional financing was unfeasible for Richmond. For this reason, they turned to tax-exempt industrial revenue bonds to finance the project. The City of Sunrise, through its city council, had to approve the issuance of these bonds. A Letter of Inducement and resolution authorizing the bonds were required of the city. Richmond also had to obtain a special exception use ordinance, as well as final site plan approval.

In October or November, 1981, Montgomery explained this process to McKettrick and Allgood. McKettrick testified that Montgomery stated that he would help sell the bonds for a fee. While they never reached a firm agreement, they discussed fees ranging from 6% for a private issue to 2% for a public sale. According to McKettrick, Montgomery and O'Keefe would split the fees between themselves, the city attorney, and "Spike" Leibowitz, a local lobbyist and friend of the mayor of Sunrise. McKettrick testified that those fees were to be paid in exchange for their assistance with construction of the project and for the defendants' help in obtaining city approval of the bonds.

In November, 1981, the defendants traveled to Augusta, Georgia, at Allgood's invitation. While in Georgia, the defendants requested $10,000.00 as an advance on the sale of the bonds. Allgood was unable or unwilling to advance any money, but he did agree to pay the interest on a $10,000.00 loan Montgomery later obtained.

Montgomery participated in the discussion and votes on the nursing home issues before the city council. On each of these three related issues, Montgomery voted in favor of the resolutions. The other city council members testified that they voted in favor of the resolutions because it was in the city's best interest. They also testified that their votes had nothing to do with anything Montgomery did to influence them. O'Keefe, a member of the Planning and Zoning Board, voted in favor of the special exemption use ordinance. That measure failed before the Planning and Zoning Board. However, that vote was only a recommendation to the city council, the final authority on such matters.

Under the Florida law then in effect, FSA § 112.3143, a public official may vote on any matter in which he has a private interest, provided he discloses the "nature of his interest" in a public memorandum within 15 days of the vote. After each vote, the defendants filed the conflict of interest forms (Form 4), which disclosed the real estate commissions, but did not describe the other fees. However, once the other fees were paid, both defendants made the appropriate disclosures.

The nursing home project was closed in Atlanta, Georgia on August 25, 1982. At

that time, the real estate commission was paid to Nob Hill and a $32,500.00 check was issued to Montgomery and O'Keefe's corporation, B & J Associates, for consulting fees. The fee paid to B & J was disclosed on the bond disclosure documents, and a portion of the consulting services were described on an invoice submitted at the closing.

The defendants filed motions to dismiss the indictment based upon allegations of prosecutorial misconduct. After an extensive pretrial hearing before Judges Roettger and Paine (who had a related case involving the mayor of Sunrise), Judge Roettger denied the motions to dismiss. Then Judge Roettger transferred the case to newly-invested Judge Thomas E. Scott, who presided over all subsequent proceedings.

At the close of the Government's case, both defendants moved for judgment of acquittal on all counts. After expressing some reservations about the Government's extortion case, the district court denied the motions. The jury returned a verdict of guilty on all counts. Subsequently, O'Keefe filed a motion for judgment of acquittal, which Montgomery adopted.

Judge Scott conducted a sentencing hearing. At the conclusion of the proceeding, he announced that he was granting the defendants' motion for judgment of acquittal as to the extortion related charges. He denied the motions as to the remaining tax charges and sentenced defendants to probation. Both the Government and the defendants filed timely notices of appeal from the portions of the judgment adverse to them.

### Prosecutorial Misconduct

The defendants argue that the district court erroneously denied their motion to dismiss the indictment due to the prosecutor's misconduct before the grand jury. Similar allegations of misconduct were raised in other cases involving this prosecutor and grand jury. An extensive evidentiary hearing was held before Judge Roettger, to whom this case was assigned initially, and Judge Paine, who tried the related cases. At the conclusion of the hearing, Judge Roettger announced that he found "considerable substance" to the defendants' charges, but refused to dismiss the indictment because he found that the defendants had demonstrated no prejudice as a result of the prosecutor's misconduct. Supp.Rec. 4 at 924–25.

The defendants assert that they made a sufficient showing of prejudice to warrant dismissal of the indictment. They argue that the misconduct which occurred here was sufficient to warrant dismissal of the indictment without a showing of prejudice.

The defendants complain that during the testimony of some witnesses the prosecutor made gestures and comments indicating disbelief of or exasperation with their testimony. They argue that this conduct was intentionally calculated to discredit these witnesses' testimony. These and other witnesses were threatened with prosecution as co-conspirators unless their testimony more closely conformed to the Government's theory of the case. The defendants point to the prosecutor's "inappropriate" behavior toward Barbara O'Keefe, the defendant's wife, after she invoked her spousal and fifth amendment privileges during her grand jury appearance. O'Keefe, himself, was paraded before the grand jury under the ruse of being a records custodian, in order to show the grand jury that he would invoke his fifth amendment privilege. The prosecutor made an unrecorded appearance before the grand jury, in violation of Fed. R.Crim.P. 6(e)(1).

The defendants also contend that the Government deliberately leaked every step of this grand jury's investigation. In support of this charge, they submitted newspaper clippings which appear to detail each aspect of the grand jury's investigation. Of particular concern are quotes and statements from "unnamed FBI sources" and a source "close to the grand jury."

The Government admits that the prosecutor's conduct toward Mrs. O'Keefe was inappropriate. Several witnesses were told that their uncooperative attitude could result in an indictment for mail fraud conspiracy. However, these threats were not made with the intent to have the witnesses

change their testimony, and no one, in fact, falsely testified to the grand jury in response to these statements. The prosecutor's brief, unrecorded visit to the grand jury room was a casual incident which does not rise to the dignity of a "proceeding," and, therefore, Rule 6(e)(1) does not apply. O'Keefe's subpoena as a records custodian was no ruse. The Government actually sought some documents involved in the tax case. Lastly, the Government argues that it was not the source of the media leaks. Numerous persons, including the defendants, could have disclosed information to the media. In sum, the Government argues no prejudice to the defendants resulted from any instances of alleged misconduct.

It is well established that federal courts have the inherent power to dismiss an indictment if a sufficiently egregious case of misconduct is shown. *E.g., United States v. Holloway,* 778 F.2d 653, 655 (11th Cir. 1985). However, we are mindful that "dismissal of an indictment for prosecutorial misconduct is an 'extreme sanction which should be infrequently utilized.'" *United States v. Pabian,* 704 F.2d 1533, 1536 (11th Cir.1983), quoting *United States v. Owen,* 580 F.2d 365, 367 (9th Cir.1978).

■ The law of this circuit establishes that prejudice to the defendant is required when dismissal of an indictment is sought based on violations of the constitution. *See e.g., United States v. Merlino,* 595 F.2d 1016, 1018 (5th Cir.1979), *cert. denied,* 444 U.S. 1071, 100 S.Ct. 1014, 62 L.Ed.2d 752 (1980). The question of whether prejudice to the defendant is required before the court may exercise its supervisory power has been deferred on several occasions. *E.g., Holloway,* 778 F.2d at 658; *Pabian,* 704 F.2d at 1540. In both of these cases, the question was not reached because the court found no prosecutorial misconduct.

■ In this case, the question is squarely presented. We agree with the district court that the prosecutor's behavior in this case was far less than exemplary. We note, however, that the defendants failed to demonstrate any prejudice as a result of this misconduct, though they had

ample opportunity to do so. The mere fact that they were indicted for crimes on which they were later granted judgments of acquittal is insufficient, standing alone, to lead to the conclusion that the prosecutor had subverted the grand jury's will to his own, or that the grand jury's independent judgment was overcome. We conclude, therefore, that prejudice to the defendant is an essential element when a criminal defendant seeks dismissal of an indictment due to prosecutorial misconduct. These defendants had ample opportunity to demonstrate prejudice. Having failed to show prejudice, we find no error in the district court's denial of their motions to dismiss the indictment.

### Montgomery's Tax and Conspiracy Convictions

Montgomery argues that the trial court erroneously denied his motion for judgment of acquittal on the tax and conspiracy counts of the indictment. He admits that he underreported his income, but argues that the evidence does not demonstrate that he acted "willfully," since he completely relied upon O'Keefe and his tax preparer to handle these matters.

■ We find no merit to this argument. The evidence established that the underreported income was substantial and it consisted of only a few items of income. Montgomery's defense, that the unreported sums were loans, could have easily been discounted by the jury, since he admitted backdating the promissory notes. Montgomery's purported reliance on O'Keefe to furnish his income to Mamo, his tax preparer, is misplaced since the largest portion of his 1982 unreported income came from B & J Associates, which Mamo did not know about, and O'Keefe did not control. We conclude that the district court properly denied Montgomery's motion for judgment of acquittal.

### Evidentiary Issues

Both defendants challenge the district court's ruling which excluded the defendants' accountant's opinion that the defend-

ants did not intend to defraud the Government. The defendants argue that since intent to defraud was an issue in this case, the trial court abused its discretion in excluding the proffered testimony.

The defendants likewise challenge the trial court's ruling which limited the testimony of their second tax expert, Ellrich. The defendants sought to elicit from Ellrich the opinion that their first expert's methodology was correct. The district court refused to allow this testimony, but allowed Ellrich to criticize the methodology of the Government's experts. The district court ruled that the second expert's testimony was cumulative and "nothing more than a personal vouching of one expert for another expert." Rec. 16 at 61.

■ Evidentiary rulings are committed to the broadest discretion of the trial court and will not be overturned except for clear abuse of that discretion. *United States v. Hurley*, 755 F.2d 788, 790 (11th Cir.1985). The conclusory opinions were of little probative value, and both experts were permitted to testify to all facts necessary to establish their good faith argument. We find no abuse of discretion in the trial court's rulings.

### Jencks Act

O'Keefe complains that the district court's refusal to order disclosure of the entire Special Agent's Report, prepared by the Internal Revenue Service, unduly restricted his right to cross-examine Government witnesses. IRS Agent Robert Stahl admitted on cross-examination that he relied on the Special Agent's Report in understanding the case. The defendants' moved, pursuant to the Jencks Act, 18 U.S.C. § 3500, for production of the report. The court examined the document *in camera* and permitted a redacted version of the report to be disclosed.

■ The Jencks Act, 18 U.S.C. § 3500, requires the Government to disclose "any statement ... of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). An examination of this report discloses that

much of the material consists of summaries of memoranda of interviews, and summaries of documents. The district court ordered disclosure of verbatim statements of the defendants' accountant Mamo. We find no error in the district court's refusal to order disclosure of the remainder of the report.

### The Government's Appeal Re Hobbs Act and Travel Act

The Government argues that the district court erroneously granted the defendants' post-verdict motion for judgment of acquittal on the Hobbs Act and Travel Act convictions. It argues that the district court viewed the evidence in the light most favorable to the defendants and credited testimony which the jury rejected. It argues that McKettrick's testimony alone was sufficient to support the jury's verdict. We disagree.

■ In considering a Rule 29 Motion for Judgment of Acquittal, the trial court is required to determine whether, viewing all the evidence in the light most favorable to the Government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict, *United States v. Brand*, 775 F.2d 1460 (11th Cir.1985), a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. *United States v. Cole*, 755 F.2d 748 (11th Cir.1985).

The defendants were charged, *inter alia*, with participating in a scheme to demand, under color of official right, $70,000.00 and other things of value in return for passage of several city resolutions. The indictment alleged that the defendants created a "false, fictitious and fraudulent invoice" to justify the payments received from Richmond Health Care.

■ In a Hobbs Act prosecution of a public official, the Government's burden is simple: it must prove that the public official obtained property from another in exchange for performance of his official duties. *United States v. Sorrow*, 732 F.2d 176 (11th Cir.1984), described the Government's burden: "The government is merely

required to prove that a public official obtained money to which he was not entitled and which he obtained only because of his official position." 732 F.2d at 180, quoting *United States v. Hedman,* 630 F.2d 1184, 1195 (7th Cir.1980), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981).

Boiled to its essentials, the Government's burden was to show that the $32,500.00 was received by Montgomery and O'Keefe in exchange for their votes on city matters. The Government proved the votes and the payments, but the question remains whether the payment was for official acts or legitimate services to which the defendants were entitled compensation.

In contrast to the allegations of the indictment, the Government presented no evidence to show that no services were performed. Instead, it relied on the fact of the defendants' official positions, payment of the consulting fee, the defendants' association with Spike Leibowitz, and the fact that the initial Form 4's disclosed only a possible real estate commission.

 On the other hand, the defendants produced substantial, uncontroverted evidence that they had in fact performed numerous services on behalf of Richmond Health Care. The defendants called a number of witnesses who specifically testified to the voluminous, non-real estate work performed by the defendants. The only evidence for the jury's consideration was that the defendants performed hours of legitimate non-real estate work and had become, in essence, Richmond's local agents for this project. The fact that Montgomery and O'Keefe performed legitimate work to which they were entitled to compensation leads this court to conclude, as did the district court, that no rational fact-finder could reasonably have found beyond a reasonable doubt that the defendants accomplished the alleged extortion.

Inasmuch as there is insufficient evidence to support the Hobbs Act conviction, the Travel Act charge fails as well. The Travel Act charge relied on Florida's unlawful compensation statute as the predicate act. That statute, FSA § 838.016, has been interpreted as being substantially identical to Hobbs Act extortion "under color of official right." *Shields v. Smith,* 404 So.2d 1106 (Fla.Dist.Ct.App.1981), *review denied,* 412 So.2d 470 (Fla.1982).

*Conclusion*

The judgment of the district court is AFFIRMED.