**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Russell BURKE, Terry Michael Butler, Terrance W. Chester, Joyce Greeson, William Frederick Honchell, Michael Evans, George Perez, Defendants-Appellants.**

**No. 86–8407.**

United States Court of Appeals,
Eleventh Circuit.

Oct. 7, 1988.

Joseph P. Quirk, Atlanta, Ga. (court-appointed for Greeson only), for Greeson & Butler, Burke and Honchell.

Denis Dean, Miami, Fla., for Evans.

Miguel A. Orta, Miami, Fla., for Perez.

Herbert Moncier, Knoxville, Tenn., for Chester.

Stephen S. Cowan, U.S. Atty., William P. Gaffney, Atlanta, Ga., for U.S.

* Honorable Joe Eaton, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1. One of the appellants, Terrance Chester, also raises the issue that "the government improperly withheld from him information regarding witnesses, including co-conspirators, informants and others who witnessed and/or participated in the commission of the indicted crimes." We relegate this issue to a footnote because we find

Before JOHNSON and CLARK, Circuit Judges, and EATON *, Senior District Judge.

PER CURIAM:

This is an appeal from the district court's denial of motions to dismiss the indictment.[1] The appellants before the court are Russell Burke, Terry Butler, Terrance Chester, Joyce Greeson, Frederick Honchell, Michael Evans and George Perez.

I. All appellants appeal on the ground that pretrial delay violated the Sixth Amendment to the Constitution of the United States or the "speedy trial" act (18 U.S.C. § 3161) [the speedy trial issue].

II. Joyce Greeson's appeal from the denial of her motion to dismiss the indictment is based on the ground that "the government made improper evidentiary and non-evidentiary use of her immunized grand jury testimony" following her having testified before the grand jury under use-immunity. 18 U.S.C. § 6003 [the Greeson immunity issue].

III. Appellants Chester, Greeson, Honchell and Perez appeal on the ground that there was such flagrant governmental misconduct during the investigative and grand jury stages of the case that to proceed upon the indictment would undermine the integrity of the judiciary. Alternatively, they seek to have the case remanded for further hearing on the ground that they were denied their Fifth Amendment rights by having been indicted by a grand jury which was not fair and impartial.

All appellants entered guilty pleas, reserving the right to appeal the issues now before this court. All have been sentenced and all are currently free on bond pending the disposition of this appeal.[2]

it to be without merit and it will not be further discussed.

2. All of the defendants arrested in this case, save the deceased T. Lamar Chester, have either pleaded guilty (some "conditionally") or have been tried and convicted. Apparently one of the defendants named in the indictment (Jose M. Galan) has never been arrested. However, the government in its brief says that the "sole remaining defendant Elliott was tried and convicted in July, 1986, and later sentenced."

## I. Speedy Trial Issue

After a careful review of the record, the district judge entered a thorough and well-reasoned order denying the speedy trial motions.

Following our review of the record, we uphold the district court's denial of the motion and for the reasons expressed in the district judge's memorandum opinion, 673 F.Supp. 1574 (N.D.Ga.1986), we affirm the district judge's determination.

## II. Joyce Greeson's Immunity Issue

■ Following an evidentiary hearing,[3] a United States Magistrate's report to the trial judge recommended that Greeson's motion raising the immunity issue be denied. Following review of the testimony and evidence submitted at the magistrate's hearing and the testimony and evidence presented to the indicting grand jury, the district judge adopted the magistrate's report and recommendation and denied Greeson's motion.

Following our review of the material reviewed by the district judge[4] and the conclusions of law set out in the district judge's order, we uphold the district judge's conclusion that the government has met its burden of establishing, by a preponderance of the evidence, that all evidence presented to the indicting grand jury was derived from legitimate sources wholly independent of Greeson's immunized testimony given before the previous grand jury. The government has met its affirmative duty as prescribed by the Supreme Court in *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

**3.** The most compelling testimony at the hearing which we have received was submitted by the government to the magistrate in camera.

**4.** The material was obtained by this court as a result of its August 26, 1987 Order to Supplement the Record.

**5.** In Greeson's brief filed with this court, she raises the point that she was compelled to give information against grand jury target Tony Chester and that the testimony she gave enabled the government to bring a case against Chester who consequently struck a plea bargain with the prosecutor and agreed to testify against Greeson.

As recited by the district judge, "Greeson's testimony provided little relevant information ...." The extent of her testimony was to confirm information previously obtained by government agents from independent sources including certain immigration forms.

As to her "non-evidentiary use of immunized testimony" position, Greeson contends that the government chose to prosecute her because the government believed that she had perjured herself when giving immunized testimony to the grand jury. We find that contention, as presented to the district court, to be without merit and we uphold the district judge in his denial of Greeson's "non-evidentiary use" motion.[5]

## III. Governmental Misconduct

■ This case arises from the same facts and indictment and this appeal is from the same district court order as *United States v. Elliott,* 849 F.2d 554 (11th Cir.1988). Issues I and II in this case are distinct from issues in the *Elliott* case. Issue III in this case—Governmental Misconduct—is identical to Issue 2 in the *Elliott* case. Since that opinion has been filed prior to this opinion, we are bound by the *Elliott* panel's holding. The appellants Chester, Greeson, Honchell and Perez make the same three arguments to us as did Elliott: (1) that the government presented fabricated and highly prejudicial documents to the indicting grand jury; (2) that the attorneys for the government abused the court's subpoena power to such an extent as to undermine the integrity of the judiciary; and (3) that there were flagrant Rule 6(e), Fed.R.

Relying upon *United States v. Hampton,* 775 F.2d 1479 (11th Cir.1985), Greeson asserts that it must be presumed that the cooperation of Tony Chester was derived from Joyce Greeson's compelled testimony.

That point was never raised in the district court. Though the government had the burden of proof on Greeson's "immunity issue," it was not required to anticipate every possible position that might have been available to the movant. Greeson must first have raised the issue in some manner in order to have placed a burden of proof upon the government on that issue.

Crim.P., violations which resulted in gross abuses of the grand jury secrecy rule. Consequently, we adopt Issue 2 of the *Elliott* opinion verbatim. 849 F.2d 554, 556–58. We have substituted "[Chester, Greeson, Honchell and Perez]" where the name "Elliott" appears.

"[Chester, Greeson, Honchell and Perez argue] that the Government presented fabricated documents to the grand jury; that Government attorneys abused the court's subpoena power; and that there were egregious violations of Fed.R.Crim.P. 6(e) which resulted in abuses of the grand jury secrecy rule. We disagree.

"At the Government's prompting, Ms. Bickerton, a public accountant formerly associated with T. Lamar Chester, fabricated documents to be included among those in her possession subpoenaed by a Houston grand jury to be presented to an Atlanta grand jury. The fabrication was arranged by Government agents in their effort to uncover a suspected obstruction of justice by Chester and two lawyers. The plan ultimately failed, and the fabricated documents were misplaced along with other genuine documents. The magistrate's report and recommendation included a finding that no fabricated documents were presented to the indicting grand jury. The district court adopted this finding upon a *de novo* review of the record. This finding is not clearly erroneous.

"[Chester, Greeson, Honchell and Perez argue] that the district court's grand jury subpoena power was abused because it was used by the Government as a pretext for investigative purposes to interview suspects, and not solely for grand jury purposes. That a subpoenaed individual is not ultimately called before the grand jury does not result in a *per se* violation of a court's subpoena power. As a practical matter, the United States Attorney is allowed considerably leeway in attempting to prepare for a grand jury investigation. *United States v. Santucci,* 674 F.2d 624, 632 (7th Cir.1982), *cert. denied,* 459 U.S. 1109, 103 S.Ct. 737, 74 L.Ed.2d 959 (1983). The United States Attorney must regularly interview witnesses prior to appearances before the grand jury to ensure that grand jurors are not burdened with duplicate information. The court's subpoena power may not, however, be used by the United States Attorney's office as part of its own investigative process. *United States v. DiGilio,* 538 F.2d 972, 985 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977). Courts necessarily play a limited role regarding grand jury proceedings given the role of the United States Attorney and the broad power inherent in the grand jury.

"A review of the grand jury testimony and records does not show an encroachment by the Government on the court's subpoena power that would compel court interference. Only by the exercise of this Court's general supervisory power to protect the integrity of the judicial process could some relief be afforded [Chester, Greeson, Honchell and Perez] on this point. On this record, we find no reason to exercise that power. *See Bank of Nova Scotia v. United States,* —— U.S. ——, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988) (court should not invoke its supervisory power to dismiss an indictment for prosecutorial misconduct in a grand jury investigation where misconduct does not prejudice the defendant).

"The record reflects some probable misconduct by some Government lawyers. The district court, however, carefully considered the allegations of violations of grand jury secrecy and concluded that [Chester, Greeson, Honchell and Perez] did not establish sufficient prejudice to warrant dismissal of the indictment. The district court found that the magistrate had given [Chester, Greeson, Honchell and Perez] a fair hearing, and was within his discretion in denying defendants' motion for production of grand jury records. We agree.

"The controlling standard for our purposes is a straightforward one:

Parties seeking grand jury transcripts under rule 6(e) must show that the matter they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy,

and that their request is structured to cover only material so needed. Such a showing must be made even when the grand jury whose transcripts are sought has concluded its operations.

*Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 222, 99 S.Ct. 1667, 1675, 60 L.Ed.2d 156 (1979) (footnote omitted). A defendant's effort to obtain grand jury materials can only succeed with a showing of "particularized need." *United States v. Procter & Gamble Co.*, 356 U.S. 677, 683, 78 S.Ct. 983, 987, 2 L.Ed.2d 1077 (1958). The decision to disclose grand jury proceedings is a matter within the district court's discretion. *United States v. Benton*, 637 F.2d 1052, 1059 (5th Cir. Unit B 1981). Particularized need is not shown by a general allegation that grand jury materials are necessary for the preparation of a motion to dismiss. *See Thomas v. United States*, 597 F.2d 656, 658 (8th Cir.1979). *See also United States v. Sells Eng'g Inc.*, 463 U.S. 418, 445, 103 S.Ct. 3133, 3149, 77 L.Ed.2d 743 (1983) (rational relationship to alleged claims is insufficient to constitute particularized need); *United States v. Cole*, 755 F.2d 748, 759 (11th Cir.1985) (unsubstantiated allegations do not satisfy particularized need standard).

"The district court found that [Chester, Greeson, Honchell and Perez] failed to show particularized need. Without this showing, [Chester, Greeson, Honchell and Perez are] not entitled to grand jury materials, nor can we require those materials to be revealed. *United States v. Liuzzo*, 739 F.2d 541, 545 (11th Cir.1984). The district court's finding on this issue is not clearly erroneous. The magistrate and district court reviewed extensively the Rule 6(e) issues in the case, as evidenced by the magistrate's order denying [Chester, Greeson, Honchell and Perez'] motion to dismiss the indictment, and the district court's affirming order.

"Among other things, the district court found: First, that the serious prejudice asserted by defendant[s] was undermined by [their] year and a half delay before appealing the magistrate's denial. Second, that the magistrate's finding that the requisite particularized need had not been shown

was not clearly erroneous. The only allegation found to approach particularized need was the allegation of fabricated documents, as to which the district court found that none came before the grand jury. Third, that defendant[s] made no attempt to particularize [their] sweeping request for grand jury records. Fourth, that, as to the transfer orders and letters, neither a showing of particularized need nor an explanation of how disclosure would assist in establishing government misconduct before the indicting grand jury. Fifth, that adopting the magistrate's finding, the Houston and Atlanta grand jury investigations were not a single, joint investigation of the same individuals and transactions. Sixth, that the majority of the alleged violations occurred in relation to the Houston grand jury investigation with little or no impact on the Atlanta grand jury investigation. Seventh, that defendant[s] had not shown that any conduct, in Houston or Atlanta, had prejudiced [their] rights or ability to make a defense in this case. *See* Order of March 31, 1986.

"[Chester, Greeson, Honchell and Perez have] the burden of showing that the requested materials covered only the particularized need. *Douglas Oil*, 441 U.S. at 222, 99 S.Ct. at 1675. Here, the district court found that [Chester, Greeson, Honchell and Perez] made no attempt to limit or particularize [their] broad request for all grand jury records, or show how disclosure would assist [them] in establishing governmental misconduct before the indicting jury. These findings are not clearly erroneous. [Chester, Greeson, Honchell and Perez] must 'show that these circumstances had created certain difficulties peculiar to this case, which could be alleviated by access to *specific* grand jury materials, without doing disproportionate harm to the salutary purpose of secrecy embodied in the grand jury process in order to justify a district court's order of the production of grand jury documents.' *Liuzzo*, 739 F.2d at 545. This [they have] not done."

We have reviewed the briefs and record in this case and affirm on Issues I and II on the basis of that review. With respect

to Issue III—Governmental Misconduct—we affirm the district court on the basis of the holding in the *Elliott* opinion, by which we are bound.

AFFIRMED.

EATON, Senior District Judge, concurring in part and dissenting in part:

With one exception, I concur in the result reached in the majority opinion. I dissent only on the affirmance of the District Court's denial of Chester, Greeson, Honchell and Perez's motions to dismiss filed on the constitutional ground that they were denied their Fifth Amendment rights by having been indicted by a grand jury that was not fair and impartial.

The investigation that ultimately gave rise to the indictment in this case began in Houston, Texas, sometime before 1980. As the investigation developed, one of the defendants later indicted in this case, Lance E. Eisenberg, became a target of the Houston investigation. He was also the subject of investigation in Miami and to some extent in Atlanta.

In June of 1981, the United States Attorney for the Northern District of Georgia, representatives of the Justice Department and approximately twenty-five law enforcement agents from various agencies of the government met to formulate a plan to coordinate the extensive investigations in which the United States Customs Service, the IRS and FBI were involved. A Houston assistant United States attorney named Johnson was designated to be the coordinator of the investigative activities. Tilton Lamar Chester became a principal target in Houston. Eisenberg and Tilton Lamar Chester later became principal targets in Atlanta. Ultimately, grand juries in Houston and Atlanta[1] heard testimony on the related "cases." Among the several persons who later became targets in the Atlanta investigation were the appellants in this case.

On October 1, 1981, the United States Attorney's office in the Southern District of Texas obtained from a district judge in Houston an order entitled "Order for Disclosure of Certain Grand Jury Records in Compliance with Rule 6(e) F.R.Cr.P." That order purported to authorize the United States Attorney in Houston and his assistants to disclose the entire grand jury records of all grand juries in existence in Houston and previously in existence in Houston relating to the investigation of ten named parties (including Eisenberg, Tilton Lamar Chester and Joseph Anthony [Tony] Chester, and "others,") to named officers of the Georgia Bureau of Investigation, named officers of the Florida Department of Law Enforcement and, in the words of the order, "the United States Attorneys' offices, their personnel, the grand juries, and agents they are using in Atlanta, Miami, Jacksonville, Tampa, Pittsburgh and New York."

Two weeks later, on October 16, 1981, the United States Attorney's office in the Northern District of Georgia, the office that has the primary responsibility to see that Atlanta grand juries deliberate free from the influence of outside pressure, obtained from a district judge of the Northern District of Georgia the order[2] that follows:

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

IN RE GRAND JURY INVESTIGATION (GJ 81–1)

MOTION

Comes now the United States of America by and through its counsel, James E. Baker, United States Attorney and [name

---

1. There were at least three grand juries in Atlanta involved in the investigation. Appropriate transfer orders were obtained regarding transfer of grand jury records within the Northern District of Georgia.

2. It appears that the order portion of the document was prepared by the prosecutor for the judge's signature and placed on the document which constituted the motion.

omitted], Assistant United States Attorney for the Northern District of Georgia, and moves this Court pursuant to Rule 6(e) of the Federal Rules of Criminal Procedure, as amended, to authorize the transfer of information relating to the investigations of Tilton Lamar Chester, Anthony Chester, Lance Eisenberg, [name omitted] and others, by a federal grand jury impaneled and sworn in this District to Special Agent William Wolfe, Florida Department of Law Enforcement, and the United States Attorneys' Offices, their personnel, the Grand Juries, and special agents being used in Houston, Miami, Jacksonville, Tampa, Pittsburgh, and New York. In support of this motion, the Government would show that:

1.

The Florida Department of Law Enforcement is and has been investigating individuals who are directly connected to the suspects of the above-referenced investigation for violations of state and federal laws including: Title 21, United States Code, Section 952; Title 31, United States Code, Section 1059.

2.

The United States Attorneys' Offices in Houston, Miami, Jacksonville, Tampa, Pittsburgh and New York by and through various agencies of the United States Government are investigating the above-referenced individuals in addition to other persons located within the various districts for violations of federal laws including: Title 26, United States Code, Section 1059.

3.

The McCaskill Grand Jury (81–1) has issued subpoenas for documentary evidence and information which has been presented to the grand jury and for additional evidence which is to be presented at future sessions of the grand jury.

4.

The above investigations will be lengthy in duration and involve extensive evidence and testimony. It will be necessary that information presented to Grand Jury 81–1 during aforesaid investigation be disclosed to Special Agent William Wolfe, Florida Department of Law Enforcement, and Robert Alcott, Esquire, Florida Department of Law Enforcement, and the United States Attorneys' Offices, their personnel, the Grand Juries, and special agents being used in Houston, Miami, Jacksonville, Tampa, Pittsburgh, and New York to properly assist government counsel in the performance of her duties.

5.

The Government further requests that so as not to compromise the secrecy of the aforesaid proceedings before a duly impaneled federal grand jury that this motion and any subsequent order by this Court be maintained under seal in the Office of the Clerk of this Court until further order.

> Respectfully submitted,
> JAMES E. BAKER
> UNITED STATES ATTORNEY
> (signature)
> [name omitted]
> ASSISTANT U.S. ATTORNEY

ORDER

The Court has reviewed the above request of the United States and pursuant to Rule 6(e) of the Federal Rules of Criminal Procedure, as amended, grants this above motion.

SO ORDERED this 16th day of October, 1981.

> [name omitted]
> UNITED STATES DISTRICT JUDGE

Thereafter, Atlanta grand jury information was freely disseminated to federal authorities in Houston. Johnson, the coordinator of the multidistrict investigation, explained that because of the transfer orders, "If we got the information, we would pass it on to the appropriate people, as well as

anybody else, such as D.E.A. or F.E.L.A., whatever," (R. Vol. 22 at p. 294), and "when the smoke all cleared on some of these investigations, we could clearly see that they were not related to Houston. So anything that we couldn't use, whether that be one little witness's statement or a bunch of documents, we'd ship it off to the appropriate people that should investigate it, if anything." (R. Vol. 22 at p. 295).

In July of 1982 Johnson left his government position and went into private law practice. After Johnson left the United States Attorney's office, he wrote a letter outlining the numerous elements under his coordinated command and the interplay among them. The letter states:

> The Internal Revenue Service eventually assigned seven Agents from Houston to work with me and one U.S. Customs agent from the U.S. Customs Service, along with other support personnel. We were working closely with the U.S. Attorney's Office in Miami, the Drug Enforcement Administration in Boston, the Massachusetts State Police Department on Martha's Vineyard, the State District Attorney's Office and Police Department in New York, the U.S. Attorney's Office in Pittsburgh, Pennsylvania, the U.S. Attorney's Office in West Virginia, the U.S. Attorney's Office in Atlanta, the Georgia Department of Law Enforcement, the Federal Bureau of Investigation in Tallahassee, Florida, the State District Attorney's Office in Fort Lauderdale, Florida, and the Police Department in Fort Lauderdale, and numerous other State and Federal Law Enforcement agencies.

In August of 1982, an Assistant United States Attorney in the Houston office offered to sell to one of the defense counsel in this case, for two hundred thousand dollars, evidence of governmental misconduct.[3] The Attorney General played part of the taped offer to the President and someone leaked the information to the press.

At least four government law enforcement agents, including the primary Atlanta "case agent," had extensive discussions with members of the press concerning the investigations. In general, it was the agents' position that they met with members of the press in order to gain helpful information about the case from the journalists with whom they spoke. It was said by one of the agents that one of the members of the press had a "colossal" amount of information and files which included extremely pertinent data. One of the newsmen was said to have known the case "inside and out."

During October, November and December of 1982, the news media gave the investigations extensive treatment. During that period a series of newspaper articles [4] concerning the coordinated investigation, including grand jury matters, appeared in the Atlanta Constitution, Atlanta Journal, Houston Chronicle, Houston Post, Washington Post, Miami Herald, Dallas Morning News, Fort Lauderdale News/Sun Sentinel, New York Times and Wall Street Journal.

Undoubtedly, vast numbers of people were familiar with matters being investigated by the grand juries.

During the hearings before the magistrate on the motions to dismiss, Chester, Greeson, Honchell and Perez repeatedly requested access to Rule 6(e)(3) transfer orders,[5] to the Rule 6(e)(3)(B) letters giving

---

3. The offeree promptly reported that solicitation to the government and aided in the government's investigation of the matter. The investigation resulted in the trial and conviction of the former Houston Assistant United States Attorney.

4. In *United States v. Eisenberg,* 711 F.2d 959, 965 (11th Cir.1983), this Court referred to the publicity as "the onslaught of publicity," which "arose in part from counsel aiding the government in investigating an offer by a government

agent to sell information concerning the grand jury."

5. During the hearing before the trial judge on the magistrate's report and recommendation, the trial judge asked the prosecutor how the government would be harmed by disclosure of the 6(e) transfer orders. The prosecutor responded that the government never considered there was a genuine issue requiring disclosure of the material. Later on in the hearing the following colloquy between the court and the prosecutor ensued:

written notice to the court of those persons designated by the attorney for the government to assist the attorney in the enforcement of federal criminal laws, (designation letters) and to grand jury records. Near the end of the hearings, the magistrate formally denied the requests. The trial judge upheld the magistrate's denial.[6]

In my judgment, appellants Chester, Greeson, Honchell and Perez clearly were entitled to access to the transfer orders, to the designation letters, and, at least, to the minutes of the indicting grand jury as those appellants sought to establish in the district court that they were indicted by a grand jury that was not fair and impartial.

The scope of the dissemination of matters before the grand juries bore directly upon the constitutional claim of Chester, Greeson, Honchell and Perez. The breadth and vagueness of the October, 1981, companion "transfer orders"[7] obtained during the early stages of the investigation may have provided an open invitation to law enforcement agents to relax the rule of

secrecy. Attorneys for the government sought and obtained orders which purported to give blanket authority for grand jury records to be disclosed to every individual employed in the office of the United States Attorney in six metropolitan areas in the country regardless of their particular work assignment in the criminal division of the office and regardless of whether the employee was employed in the civil or criminal division of the office. According to the orders, disclosure could be made to any special agent "being used" in those six metropolitan areas, whatever the nature of the agent's assignment, as well as to two officers of the Florida Department of Law Enforcement, whose agency was investigating "violations of state and federal laws," and to named officers of the Georgia Bureau of Investigation.[8]

At the time the "transfer orders" were obtained,[9] Rule 6(e) required the attorney for the government to obtain an order from the court to transfer grand jury records

THE COURT: Why in the world did that have to be done in camera?

[ATTORNEY FOR THE GOVERNMENT]: Your Honor, all the grand jury information is submitted in camera. The question—I think the Magistrate felt that it was not a, that it was not a matter in dispute. To the extent that the order exists, I would concede that the *joint transfer orders between them are certainly innocuous on their face.* All they do is—

THE COURT: That is what I can't understand. You just put issues out there that need not be there. (R44–196). (Emphasis supplied.)

6. I am convinced from study of the record of the hearing before the District Judge on the Magistrate's report and recommendation that the companion "transfer orders" were never presented to the District Judge. The magistrate's report and recommendation states only that "Rule 6(e) orders were obtained from the district court in Houston to transmit information to Atlanta and Atlanta obtained Rule 6(e) orders to transmit information to Houston" (Magistrate's Report and Recommendation at 11–12). The companion "transfer orders" were not a part of the appellate record until this court obtained them by use of its August 26, 1987 order to supplement the record.

7. I recognize that the orders presented to the district judges indeed were signed by the judges. The fact that orders for transfer of grand jury records from one grand jury to another federal grand jury were quite routinely entered under

the rule as it existed in 1981 may have contributed to the signing of the orders. The judges' reliance upon and confidence in the office that prepared and presented the orders for signature may have been contributing causes. The significance of the presentation of the orders to the judges is that the orders demonstrate a lack of leadership from the outset of the investigation in the preservation of the critical secrecy of the grand jury.

8. Rule 6(e)(3)(A)(ii), Fed.R.Crim.P., was amended in 1985 to specifically show that the term "government personnel deemed necessary to assist an attorney for the government in the performance of such attorney's duty to enforce federal criminal law" includes personnel of a state or a subdivision of a state. That same year, Rule 6(e)(3)(C), Fed.R.Crim.P., was amended by the addition of new subdivision (e)(3)(C)(iv), which allows a court to permit disclosure to a state or local official for the purpose of enforcing state law when an attorney for the government so requests and makes the requisite showing. Disclosure of a state criminal violation must be made in such manner, at such time, and under such conditions, as the court may direct.

9. A 1983 amendment to Rule 6(e)(3)(C), Fed.R.Crim.P., added subdivision (e)(3)(C)(iii) to specifically allow disclosure to be made by an attorney for the government to another federal grand jury.

from one grand jury to another federal grand jury.[10] However, the attorney for the government was authorized to make the decision as to the government personnel necessary to assist him or her in enforcing the federal criminal laws. The requirement of the rule in that regard was that the names of those persons designated to provide assistance were to be given to the court in writing, in order to provide a "paper trail" to facilitate resolution of subsequent claims of improper disclosure. (Notes of Committee on the Judiciary, Senate Report # 95–354, U.S.Code Cong. & Admin. News 1977, p. 527, 1977 Amendment, Advisory Committee Notes, Rule 6, Federal Rules of Criminal Procedure.)

When disclosure of matters occurring before an indicting grand jury is not in fact limited to those persons designated as persons necessary to assist the attorneys for the government[11], the impartiality of the indicting grand jury may be affected by widespread discussions—through the news media or otherwise—whether or not the discussions are based upon fact.

I see no valid reason for denying access to the "transfer orders" and the "designation letters." The obligation of secrecy imposed by Rule 6(e) applies to matters occurring before a grand jury. Requests for access to transfer orders and designation letters are not requests to reveal matters which transpired during grand jury proceedings as are requests for disclosure of grand jury minutes, testimony, or documentary evidence.

The "particularized need" requirement stems in part from Rule 6(e)(3)(C): "Disclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made .... (ii) when permitted by a court at the request of a defendant, upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury." The necessary showing of "particularized need" as discussed in *United States v. Luizzo,* cited by the majority, and its well known predecessors applies to requests for disclosure of the content of grand jury proceedings. Practically speaking, grand juries need never see transfer orders and designation letters. Their disclosure would have revealed no secret aspect of the grand jury investigation.

Of course, the decision to grant or deny access to the district court's transfer orders and the attorney's designation letters is to be made in the exercise of the court's reasonable discretion, but the showing necessary to obtain access need not rise to the "particularized need" requirement as discussed in *United States v. Luizzo* and its predecessors.

And speaking of "particularized need," if this extraordinary record does not establish that predicate for the disclosure of at least the minutes of the indicting grand jury, I foresee no set of facts that will.

The indictment was returned October 3, 1983. The lengthy evidentiary hearings on the various motions began on August 7, 1984. The magistrate's report and recommendation was made over two years post-indictment. The district judge's order on the report and recommendation, based upon the voluminous record before the magistrate, was entered two and one-half years post-indictment.

The need for disclosure of at least the minutes of the indicting grand jury appears far greater than the need for secrecy. In my judgment, access to at least the minutes of the indicting grand jury was needed to avoid possible injustice.

In the interest of justice and in the interest of the maintenance of grand jury secrecy, disclosure of the transfer orders, the designation letters, and at least the minutes of the indicting grand jury should have been allowed considering the undisputed facts outlined here.

---

**10.** That approval could be sought under 6(e)(3)(C)(i)—"Disclosure made preliminarily to or in connection with a judicial proceeding."

**11.** Approximately one hundred names of persons designated as necessary to assist the Atlanta attorneys for the government were presented between March 17, 1981, and March 2, 1984, by letters to the District Court of the Northern District of Georgia.

The majority tells us that appellants Chester, Greeson, Honchell and Perez make the same three arguments on the "governmental misconduct" issue on this appeal as did Elliott in *United States v. Elliott*, 849 F.2d 554 (11th Cir.1988), and that is true. The majority lists the arguments as "(1) that the government presented fabricated and highly prejudicial documents to the indicting grand jury; (2) that the attorneys for the government abused this court's subpoena power to such an extent as to undermine the integrity of the judiciary; and (3) that there were flagrant Rule 6(e), Fed.R.Crim.P. violations which resulted in gross abuses of the grand jury secrecy rule." Since the opinion in *Elliott* was filed before the majority opinion in this case, the majority finds that we are bound by the *Elliott* panel's holding on those issues. I have no disagreement there.

The primary position of Chester, Greeson, Honchell and Perez on the "governmental misconduct" issue is that any one of the three alleged derelictions or the totality of the circumstances presented is sufficient to cause this court to exercise its *inherent supervisory power* by dismissing the indictment against them even in the absence of a showing of actual prejudice.[12] They urge that there was such flagrant governmental misconduct during the investigative and grand jury stages of the case that to proceed upon the indictment would undermine the integrity of the judiciary.[13]

The *Miller* panel has answered and rejected that argument, albeit on an appeal filed by co-defendant Miller.

However, Chester, Greeson, Honchell and Perez seek on this appeal, in the alternative, to have the case remanded for further hearing on the constitutional issue, raised and argued, that they were denied their Fifth Amendment rights by having been indicted by a grand jury which was not fair and impartial, on which issue, of course, actual prejudice must be demonstrated. It is on the alternatively raised constitutional issue that I express disagreement with the majority's affirmance of the district court's denial of Chester, Greeson, Honchel and Perez's motions to dismiss the indictment.

My opinion is that Chester, Greeson, Honchell and Perez should have a fair opportunity to establish their constitutional position before the district court, and I would afford them that right.

---

**12.** The initial brief of those appellants was filed before the publication of *Bank of Nova Scotia v. United States*, — U.S. —, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988); *United States v. Bollivian*, 819 F.2d 266 (11th Cir.1987); *United States v. O'Keefe*, 825 F.2d 314 (11th Cir.1987); and *United States v. Ricks*, 817 F.2d 692 (11th Cir.1987).

**13.** From time to time the courts' limited power exercised in its relationship to the grand jury is confused with the court's inherent supervisory power exercised in order to protect the integrity of the judiciary. The confusion surfaces when the governmental misconduct of which complaint is made arises in the context of grand jury proceedings. The confusion most often surfaces when the movant alleges gross misconduct by the government in the presence of the grand jury.

In *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), the Supreme Court announced its "general supervisory power" as a basis for decision, a power described by the Court as resting neither on constitutional nor statutory grounds. Since *McNabb*, the supervisory power, generally referred to as "the inherent supervisory power of the Court", has been employed at all levels of the federal judiciary in extreme circumstances to cover a broad range of judicial actions.

The Supreme Court has recognized the supervisory power doctrine's applicability, along with its important limitations, to all levels of the federal judiciary. *United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980); *United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983); *Bank of Nova Scotia v. United States*, — U.S. —, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988).

However, the grand jury was constitutionally established as an *independent* entity. Though constitutionally established, it is very much a *creature of the common law*. The court does *not* possess inherent supervisory power over the grand jury.