**AMERICAN SAMOA GOVERNMENT,**

**v.**

**FAULALO LEALI`IE`E, Defendant.**

High Court of American Samoa
Trial Division

CR No. 49-99

April 5, 2000

Before RICHMOND, Associate Justice, TUAOLO, Chief Associate Judge, and SAGAPOLUTELE, Associate Judge.

Counsel: For Plaintiff, Frederick J. O'Brien, Asst. Attorney General
For Defendant, Bentley C. Adams III, Asst. Public Defender
ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL

Plaintiff American Samoa Government ("ASG") accused defendant Faulalo Leali`ie`e ("Leali`ie`e") of committing three felonies, burglary in the first degree, rape, and sodomy, in the information. Trial by jury began on February 29 and concluded on March 3, 2000. Leali`ie`e, defense counsel, and prosecutor were present throughout the trial. On March 3, 2000, the jury convicted Leali`ie`e of the three crimes charged.

## Material Procedural History

On February 29, 2000, after the jury was selected, but before evidence was presented, Leali`ie`e moved *in limine* to exclude the victim's show-up identification of Leali`ie`e and related evidence. Though well past the pretrial motion deadline, the Court allowed the motion to be made, because defense counsel had only recently joined the Public Defender's Office and been assigned this case.

Testimony on this issue was taken on February 29 outside the jury's presence. However, the testimony did not fully develop all circumstances related to the issue. Since the victim had only recently turned age 14, we decided that the victim should not be required to testify further outside the jury's presence and, if we denied the motion, then again before the jury. We also did not want to further delay presentation of the case to the jury. Thus, next morning, March 1, 2000, we advised counsel that the trial would proceed, and we would rule on the issue when all the relevant evidence had been presented.

On March 2, 2000, again outside the jury's presence and before ASG rested its case, the parties argued the issue to exclude the show-up identification and related evidence. On March 3, 2000, still outside the jury's presence, we denied the motion to exclude this evidence. Then, after ASG indicated it would rest its case as soon as a stipulation on

114

another matter had been presented to the jury, Leali`ie`e was allowed to make and the parties argued, again outside the jury's presence, a motion for a judgment of acquittal pursuant to T.C.R.Cr.P. 29(a). Leali`ie`e's arguments on this motion also focused on the show-up identification issue. We then denied this motion.

On March 3, 2000, after the jury returned verdicts of guilty, Leali`ie`e renewed the motion for a judgment of acquittal, this time pursuant to T.C.R.Cr.P. 29(c). We took the motion under advisement and will now deny it.

## Discussion

### I. The Judgment of Acquittal Standard

The standard to apply in ruling on a motion for a judgment of acquittal is set forth in T.C.R.Cr.P. 29(a) as follows:

> The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the information after evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

■ "In considering a motion for acquittal, a trial court must 'determine whether, viewing all the evidence in the light most favorable to the Government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict, a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt.'" *Am. Samoa Gov't v. Tauala*, 25 A.S.R.2d 179, 180 (Trial Div. 1994) (quoting *United States v. O'Keefe*, 825 F.2d 314, 319 (11th Cir. 1987)).

### II. The Offenses

Leali`ie`e does not dispute that the offenses charged were committed, only that the evidence does not prove beyond a reasonable doubt that he was the perpetrator. We therefore only summarize the evidence of the crimes themselves.

During the night of July 5, 1999, the unmarried female victim, then age 13 years, was sleeping on the living room floor in her home in Tafuna, American Samoa. She was awakened by biting mosquitoes around 10:00 p.m. She next became aware of a man sitting beside her. The man had entered the house, without anyone's permission, by removing louvres from the window adjacent to the front door of the house that opened into the living room.

During the ensuing minutes, the man, using scissors in a threatening manner, partially disrobed the victim, kissed her mouth and breasts, fondled and kissed her vagina, and had sexual intercourse with her. These acts were forcibly compelled upon the victim without her consent. The attack ended and the man fled when the victim's sister unexpectedly entered the house at the back door.

These facts clearly establish commission of the crimes of burglary in the first degree, rape and sodomy, as respectively described in A.S.C.A. §§ 46.4030(a)(3), 46.3604(a)(1), and 46.3611 (A)(1).

### III. The Perpetrator's Identity

During the trial, the victim clearly and unequivocally identified Leali`ie`e as her attacker. However, Leali`ie`e asserts that the victim's in-court identification was irreparably mistaken as a result of an impermissively suggestive show-up conducted by the police three days after the crimes were committed. He further argues that without the in-court and show-up identifications, the evidence is insufficient to sustain beyond a reasonable doubt his convictions as the perpetrator of the crimes.

### A. The Other Identification Evidence

Leali`ie`e and his nephew, Torise Lemalu ("Torise") were together the night of the crimes at the house of Papipai Titio and Asofa Titio ("the Titios") in the same neighborhood as the victim's house. Leali`ie`e and Torise left the house together at some point and apparently spent some time at Lion's Park nearby picking up empty bottles to turn in for cash. According to the Titios, this departure was at or after 11:00 p.m., well after the crimes. Leali`ie`e was then living at the house of his sister, Torise's mother, also in the same neighborhood.

Torise told Sgt. Pou T. Supapo ("Supapo"), the principal police investigator assigned to the case, and wrote a statement to the effect that while together on the night of the crimes, Leali`ie`e told Torise to wait for him and walked away towards and later returned from the direction of the victim's house, and that Leali`ie`e then told him to only say that they went to Lion's Park. However, Torise recanted his statement on the witness stand and accused Supapo of writing the statement he signed and threatening him with mace, or the like, in the process. ASG could only impeach Torise's testimony with the prior inconsistent statement and the actual circumstances surrounding its making. Torise did testify that he and Leali`ie`e went to the park about 11:30 p.m. that night to pick up empty bottles.

The victim testified that during the attack she momentarily saw another

person that she could not identify standing at the window near the front door to the house. Not long after the crimes, Sina Asiata, the victim's aunt, was looking with a flashlight in the area around the victim's house and saw two men and a dog walk by the dark side of the house. She believed the dog belonged to Torise, but could not recognize the men. About 1:00 to 1:30 a.m. the next morning, Joanne Seti, another aunt, saw two men that she could not identify sitting under a tree about 50 feet from the victim's house. She also saw Torise giving Leali`ie`e a haircut outside Torise's house later the next morning.

The police recovered the scissors used to threaten the victim, but found nothing to specifically tie Leali`ie`e to them. Near the victim's house, the police also found three unbroken louvers, apparently removed from the window to facilitate entry into the house for the attack. Latent fingerprints were lifted from the louvers, but were not identified with any known fingerprints, including Leali`ie`e's prints submitted for comparative analysis.

Leali`ie`e also testified. He simply denied that he committed the crimes.

In sum, Leali`ie`e's connection to the crimes depends entirely on the admissibility and believability of the victim's in-court and show-up identifications of him as her attacker.

## B. The Show-up Identification

Suggestive show-up identification procedures may deny an accused the fairness of due process. Such procedures do not, however, render the evidence inadmissible if the identification is still reliable under the totality of circumstances. *See Am. Samoa Govt v. Afamasaga*, 17 A.S.R.2d 145, 147 (Trial Div. 1990).

As recognized in *Afamasaga*, 17 A.S.R.2d at 147, the Supreme Court has identified five principal factors to be weighed against "the corrupting effect of the suggestive identification itself" in the reliability evaluation:

> These [factors] include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.

*Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

*1. Victim's View of the Criminal and Degree of Attention*

The only electric light turned on at the house during the attack was

outside at the back door into the room where the victim slept. The light provided a little illumination at this area in the room. The victim could not recall how long the attack lasted. However, it lasted long enough for the attacker to accomplish his criminal purposes. The victim was busy resisting the attacker at first, but she realized that resistance was futile. Then the attacker was on top of the victim, face to face, while he had sexual intercourse with her.

Though the time span was apparently not lengthy and the situation was both emotionally and physically turbulent, the victim had adequate opportunity to gain a lasting impression of her attacker's face and body and could not help but pay close attention to him during the rape. *See, e.g., Page v. Borg*, No. C-91-3986-VRW, slip op. at 7 (N.D. Cal. Dec. 6, 1993) (identification reliable because rape victim faced perpetrator and identified him immediately upon seeing him at the police station).

### 2.. Accuracy of Victim's Prior Description of the Criminal

Supapo interviewed the victim the night of the incident. According to Supapo, the victim described her attacker at that time as being of medium and slightly muscular build and having a small mustache, unshaven face, hair to the neck line (which Supapo took to mean extended in back and not necessarily long on top), and tattoos on his arms. The victim told Supapo that she had never seen her attacker before the incident, but she could recognize him if she saw him again. During the trial, however, the victim only recalled that her attacker was a Samoan with short hair and a rough beard. She no longer recalled any tattoos or scars as distinguishing marks.

The morning after the attack, July 6, 1999, Torise cut Leali`ie`e's hair outside Torise's house not far from the victim's house. Leali`ie`e requested the haircut. The parties stipulated that Leali`ie`e had tattoos on both arms.

The victim's descriptions of her attacker to the police initially and as diminished at trial contain both similarities and discrepancies. Neither description may be considered as very complete, but this is understandable given the circumstances of the attack, the victim's age, and her lack of any contact with the criminal before the incident. The limited descriptions are also consistent with Leali`ie`e's actual appearance, and except for hairstyle or length, Leali`ie`e did not dispute this comparative appearance. While not a strong factor in this case, the victim's prior description is not without merit.

### 3. The Victim's Level of Certainty at the Show-up

Sina Asiata, the victim's aunt, was looking outside shortly after the

attack with a flashlight and saw two men with a dog walk nearby. She could not identify either man, but she recognized the dog as belonging to Torise. During Supapo's initial investigation, she learned of this event and heard the names of Leali`ie`e and Torise mentioned. Thus, in order to cover all bases, Supapo went to Torise's home on July 8, 1999. Both Leali`ie`e and Torise were there. Supapo asked them to come to the Tafuna police substation to be interviewed about their knowledge of the attack. Neither one was then a suspect or arrested and they went to the substation voluntarily.

At the substation, Leali`ie`e was placed in a conference room and Torise in an interrogation room. Supapo then telephoned Taumaoe Iakopo ("Iakopo"), a social worker, to bring the victim, who was temporarily in a protective juvenile shelter, to the substation. Supapo told Iakopo that she wanted to interview the victim. Iakopo testified that en route the victim was told that she would be asked if she saw her attacker there. According to Supapo, she did not mention identification of anyone to Iakopo. During her testimony, the victim admitted that she had previously testified she knew she would be asked to identify her attacker at the substation, but she also insisted she did not know that was the purpose beforehand and was surprised to see him there. The victim also admitted that she had previously testified that Supapo drove her to the substation, but in fact Iakopo took her there.

Supapo met the victim and Iakopo outside the substation. As the three of them walked inside and towards the conference room, Supapo asked the victim if she still remembered the appearance of her attacker. According to Supapo, the victim looked like she was uncertain and did not answer the question. At the conference room door, Supapo asked the victim to look inside through the door window to see if she recognized anyone inside, but did nothing to single out Leali`ie`e. Uniformed police officers, probably two or three, were interviewing others in civilian clothing in the room. Leali`ie`e was not handcuffed or placed in any distinguishing location. *Compare United States v. Field, 625 F.2d 862, 869 (9th Cir. 1993) (pretrial identification unreasonably suggestive where witness observed suspect handcuffed, in custody, alone in a hallway).*

Iakopo testified that the victim's confusion occurred for some time when asked if she recognized anyone in the room, rather than when asked if she could still recognize her attacker while walking towards the conference room. According to Supapo, however, within a few seconds of looking through the door window, the victim pulled back from the window, wide-eyed, and in effect said, "That's him." Asked what she meant, the victim, again in essence, said, "The one who did something bad to me." Asked what he was wearing, the victim stated that he was wearing a blue tank top and also mentioned his unshaven appearance and

119

arm tattoos. The victim had identified Leali`ie`e as her attacker.

When testifying about the show-up identification, the victim did not specifically recall any questions or discussion. She testified that Supapo opened the door to the conference room. She was then surprised to see her attacker in the room and immediately told Supapo that Leali`ie`e was that person. She did not recall what Leali`ie`e was wearing at the substation. She admitted that the preliminary examination transcript indicated that she said she did not recognize anyone when she was at the substation, but she did not really remember what she said at that hearing. The victim did not waiver during her testimony, however, regarding her identification at the substation of Leali`ie`e as her attacker.

While Leali`ie`e presented evidence in an attempt to impeach the testimony related to the show-up identification in various ways, there is still substantial evidence that the victim identified Leali`ie`e at the substation with a high degree of certainty.

*4. Time Between the Crimes and Show-up Identification*

The victim confronted Leali`ie`e at the substation three days after the crimes. We are not dealing with the dimming of memory after months or even weeks. The victim's mental image, however general, of her attacker was likely still vivid after this short time span.

*5. Conclusion Regarding the Show-up Identification Reliability*

■ The reliability evaluation of the show-up identification is not unequivocal. The evidence has both strong and weak points with respect to the five evaluation factors. We cannot say, however, that the evidence is legally insufficient to establish reliability. To the contrary, from the evidence, the jury as the factfinder could readily believe the victim's in-court and show-up identifications and find beyond a reasonable doubt, as the jury did, that Leali`ie`e committed the crimes.

## Conclusion and Order

The evidence is not insufficient to sustain Leali`ie`e's convictions for the three crimes charged in the information. We therefore deny Leali`ie`e's renewed motion for a judgment of acquittal.

It is so ordered.