[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 6, 2004
THOMAS K. KAHN
CLERK

No. 03-10857

D. C. Docket No. 99-00324-CR-T-23-A

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

STEVEN B. AISENBERG,
MARLENE J. AISENBERG,

Defendant-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(February 6, 2004)**

Before BLACK, HULL and COX, Circuit Judges.

HULL, Circuit Judge:

The government appeals the district court's order granting: (1) attorney's fees in the amount of $2,680,602.22 under the Hyde Amendment for the bad faith prosecution of Steven and Marlene Aisenberg in connection with the

disappearance of their daughter Sabrina, and (2) the wholesale disclosure of all grand jury transcripts. After review, we reverse and reduce the attorney's fee award to $1,298,980.00. We also vacate the ordered disclosure of all grand jury transcripts.

## I. FACTUAL BACKGROUND

Because this case has an extensive procedural history, we first outline the events leading to the wiretapping of the Aisenbergs' home in 1997 and 1998, the indictment of the Aisenbergs in 1999, the dismissal of that indictment in 2001, and the award of attorney's fees and wholesale disclosure of all grand jury transcripts in 2003.

### A. Missing Child Investigation

During the early morning of November 27, 1997, Marlene Aisenberg placed a call to "911" to report the disappearance of her five-month-old daughter, Sabrina Aisenberg. Law enforcement officials conducted an intense and exhaustive search for the child, which was ultimately unsuccessful. The child remains missing to this day.

Throughout their interactions with the Aisenbergs and after making no headway in their recovery efforts, law enforcement officials developed suspicions directed at the Aisenbergs. On December 12, 1997, sixteen days after the child's

2

disappearance, the county sheriff's office successfully applied to the state circuit court for authorization to intercept oral and telephonic communications in the Aisenbergs' home.

The December 12, 1997, application for electronic surveillance was supported by an affidavit signed jointly by detectives Linda Sue Burton and William Blake of the county sheriff's office. The affiants claimed that probable cause existed to believe that the Aisenbergs murdered or sold their child based on certain facts.[1] The state circuit court authorized the wiretap, and on December 13, 1997, law enforcement officials placed electronic interception devices in the Aisenbergs' home.

On January 9, 1998, and again on February 6, 1998, the county sheriff's office applied for extensions of the wiretapping authority, relying on: (1) transcripts of the Aisenbergs' conversations obtained during the December 1997 wiretaps; (2) a pediatrician's opinion that pictures of the child indicated that hair

---

[1]Some of the facts alleged were that: (1) Marlene Aisenberg sounded hysterical in her initial "911" missing-child report, but while her husband spoke to the "911" operator, she spoke calmly to an unknown party on another telephone; (2) there was not enough food or diapers in their home to maintain the well-being of a five-month-old child for one day; (3) during the county detectives' third interview of Marlene Aisenberg, she made statements and gestures indicating that she knew the person who took the child and that the child was being taken care of; and (4) the county detectives' telephonic interview with an FBI special agent regarding a study indicating that in 91.67% of cases where the last location of a child under age one is the victim's home, the child was killed in the home by a caregiver.

had been pulled out of the left side of the baby's head and the area around the left eye was bruised; and (3) statements by the hair dresser of the Aisenbergs' children that she noticed hair missing from the child's head. The state circuit court granted the extension applications, and the wiretapping continued until March 2, 1998, resulting in seventy-nine days of surveillance and including 2,600 conversations recorded on fifty-five audio recordings. As discussed later, the magistrate judge ultimately found that the Aisenbergs' conversations intercepted from the December 1997 wiretaps were largely unintelligible and that the pediatrician's and the hairdresser's statements in the extension applications were misquoted or taken out of context.

## B.    Indictment and Arrest

On January 30, 1998, the United States served the Aisenbergs with subpoenas to appear before the grand jury. The Aisenbergs communicated their unequivocal intent to invoke the Fifth Amendment before the grand jury and so advised the government through correspondence and a hearing before the district court. The government insisted that the Aisenbergs still appear. On February 11, 1998, the Aisenbergs appeared before the grand jury, invoked their Fifth Amendment rights, and refused to answer most questions.

On September 9, 1999, a federal grand jury returned a seven-count

indictment against the Aisenbergs.[2]  The indictment charged the Aisenbergs with one count of conspiracy to make false statements of material facts to law enforcement officials, in violation of 18 U.S.C. § 371, and with six counts of making false statements of material facts to law enforcement officials during the initial missing child report and during the subsequent investigation, in violation of 18 U.S.C. §§ 1001 and 1002.  On the same day, the Aisenbergs were arrested in Maryland, where they had moved.

The Aisenbergs appeared at an initial hearing at which the government urged the magistrate judge (1) to require the Aisenbergs to submit to urinalysis and (2) to require investigation by a social services professional to protect the Aisenbergs' other two children.  During that hearing, an Assistant United States Attorney asserted that the government had in its possession a taped statement in which Steven Aisenberg stated, "I wish I hadn't harmed her.  It was the cocaine." The government also claimed to have in its possession taped statements indicating that the Aisenbergs were "drugged."  As will be discussed later, the district court ultimately determined that the recordings purportedly containing these alleged statements were "largely inaudible" and the magistrate judge found them

---

[2]The 1999 indictment was returned approximately twenty-one months after Sabrina's disappearance in late 1997 and eighteen months after the termination of the wiretapping in early 1998.

"unintelligible."[3]

### C.    Motion to Suppress

On February 17, 2000, the Aisenbergs filed a motion to suppress the audio recordings of their home and the related transcripts. The Aisenbergs' motion claimed that the county detectives' affidavits, supporting the wiretap applications, contained false statements, that without these statements there was no probable cause for the wiretaps, and that the audio recordings of their home must be suppressed. The Aisenbergs also requested an evidentiary hearing based on Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674 (1978).[4]

During December 2000 the magistrate judge conducted a Franks evidentiary hearing, which involved ten days of testimony from forty witnesses and over one

---

[3]Shortly after the indictment, the government moved to disqualify the Aisenbergs' defense counsel and to compel retention of separate, independent counsel. The government argued that defense counsel had a conflict of interest in representing both Aisenbergs. In denying the motion, the magistrate judge stressed, inter alia, that the Aisenbergs had made a knowing and intelligent waiver of conflict-free representation, that the government had not shown that an actual or serious potential conflict existed by the joint representation, that the government had not shown that it was likely that one defendant would testify against the other, and that the prejudice caused by disqualifying defense counsel outweighed the government's perceived concerns. The government did not appeal this determination.

[4]In Franks, the Supreme Court held that where a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by an affiant in a search warrant affidavit, and if the allegedly false statement was necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request to determine admissibility of the fruits of the search. 438 U.S. at 171-72, 98 S. Ct. at 2684-85.

6

hundred exhibits, primarily from the government's investigative files. On February 14, 2001, the magistrate judge issued a comprehensive report recommending that the district court suppress all audio recordings from the wiretaps of the Aisenbergs' home. United States v. Aisenberg, 247 F. Supp. 2d 1272, 1324-57 (M.D. Fla. 2003).[5]

In his report, the magistrate judge made extensive fact findings based on the voluminous evidence during the Franks hearing.[6] For example, the magistrate judge found: (1) that in the initial wiretap application, the county detectives not only made false statements, but also omitted material facts regarding the Aisenbergs' initial missing child report; (2) that in the initial wiretap application, the county detectives' statement that Marlene Aisenberg was "calm" and "collected" was made with reckless disregard for the truth; (3) that the county detectives failed to inform the state circuit court that they knew several people who had seen the child the day before the missing report but had not yet interviewed them; (4) that the county detectives failed to inform the state circuit

_____

[5]Although the magistrate judge's report was filed on February 14, 2001, the district court later published the magistrate judge's report as an attachment to its January 31, 2003, order awarding attorney's fees under the Hyde Amendment. Thus, we cite to the now published magistrate judge's report.

[6]In addition to over one hundred exhibits, there are ten volumes of transcripts from the Franks hearing, which cover 2,585 pages.

court that they were still awaiting the financial analysis of the couple and the

crime lab's processing of the evidence; (5) that in their extension applications, the

county detectives reported conversations that no reasonably prudent listener could

hear from the tapes, that the county detectives quoted conversations that do not

even appear at all in the supporting transcripts of the tapes or do not appear in the

manner described, and that the county detectives deliberately or with reckless

disregard summarized conversations out of context;[7] (6) that after redacting the

unintelligible conversations in the recordings, the county detectives' applications

for wiretap extensions did not support probable cause to believe that the

Aisenbergs committed murder;[8] (7) that the Aisenbergs' intercepted

---

[7]In his report, the magistrate judge described the wiretap application process in great detail and outlined how errors occurred in the wiretap extension applications, in the handwritten summaries of those tapes, and later in the more formal transcripts of those tapes. Aisenberg, 247 F. Supp. 2d at 1325-27.

[8]During the Franks evidentiary hearing, the Aisenbergs' expert, Bruce E. Koenig, testified that all the wiretaps had problems. Koenig previously served as the Special Agent Supervisor in the FBI's engineering section and received a bachelor of science from the University of Maryland and a master's degree in forensic science from George Washington University, as well as completing graduate level courses at George Mason University, University of Utah, and Massachusetts Institute of Technology, and electronic courses at DeVry Institute of Technology in Chicago. According to Koenig, the intercept system introduced extraneous sounds such as ringing phones, hissing, and humming; this noise directly impacted the ability to understand the recorded speech; and distortion, caused by microphones picking up the speakers' voices from too great a distance, added to the unintelligibility. The qualifications of the government's expert, Anthony Pellicano, starkly contrasted with Koenig's. Pellicano received his high school equivalency while serving in the military and never obtained advanced schooling. Although Pellicano stated that he was able to hear the Aisenbergs' conversations set out in the county detectives' applications, Koenig, the district court, and the magistrate judge could not.

communications were unrelated to offenses included in permissible wiretaps under Florida's wiretap scheme, and thus should be suppressed; (8) that during the wiretaps, law enforcement officials failed to minimize the recordings of conversations not otherwise subject to the interception authorization, as required by Florida Statute § 934.09(5) (1997); and (9) that the county detectives had not met the elements of Florida Statute § 934.09(1)(c) (1997), requiring that they demonstrate that they had tried other reasonable investigative procedures before applying for electronic surveillance. Aisenberg, 247 F. Supp. 2d at 1331-57.

After the magistrate judge's report of February 14, 2001, the district court never ruled on the Aisenbergs' motion to suppress because the United States Attorney's Office promptly moved for leave to dismiss the indictment against the Aisenbergs. On February 22, 2001, the district court dismissed the indictment.[9]

### D.    Aisenbergs' Application under Hyde Amendment

On March 26, 2001, the Aisenbergs moved for an award under the Hyde

---

[9]In addition to filing a motion to suppress, the Aisenbergs also filed a motion for an audibility hearing challenging the accuracy of the transcripts of the tapes that the government sought to use at trial. On April 17, 2000, the government requested a delay of the audibility hearing until trial, or alternatively for each party to submit separately prepared transcripts to the jury without any audibility hearing. The government later obtained other delays of the audibility hearing before the district court. Although the district court entered a November 9, 2000, order noting that the quality of the audio recordings was "generally poor," the actual audibility hearing before the district court never occurred because on February 14, 2001, the magistrate judge recommended that the district court grant the Aisenbergs' motion to suppress, and the government then dismissed the indictment on February 22, 2001.

Amendment, which provides that the court may award attorney's fees and other litigation expenses if the "court finds that the position of the United States was vexatious, frivolous, or in bad faith." Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes).[10] In response, the government conceded that an award of fees and litigation expenses was appropriate under the Hyde Amendment, but disputed the amount of fees owed.

At the government's request, the district court ordered that the parties participate in mediation. The mediator issued a June 13, 2002, report stating that "the parties have reached an impasse." The parties then presented their Hyde Amendment arguments to the district court over a four-day hearing during October 2002.

On January 31, 2003, the district court awarded the Aisenbergs $2,680,602.22 in attorney's fees and $195,670.32 in litigation expenses under the Hyde Amendment. Although the government had conceded the applicability of the Hyde Amendment, the district court's order recounted at great length the

---

[10]"The Hyde Amendment was enacted as part of P.L. 105-119, the . . . Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act of 1998, and is found as a statutory note to 18 U.S.C. § 3006A." United States v. Gilbert, 198 F.3d 1293, 1298 (11th Cir. 1999).

events evincing the government's bad faith prosecution of the Aisenbergs. Aisenberg, 247 F. Supp. 2d at 1275-87.[11]

In the district court, the government emphasized that the Hyde Amendment subjects awards to "the procedures and limitations" provided for under 28 U.S.C. § 2412, which, the government pointed out, includes a $125 hourly limitation on attorney's fees in § 2412(d)(2)(A)(ii). Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes). The district court, however, agreed with the Aisenbergs (1) that they were not limited to this $125 hourly limitation in § 2412(d)(2)(A)(ii), but rather could recover rates up to $400 per hour as attorney's fees under § 2412(b), and (2) that even if § 2412(d)(2)(A)(ii) applied, special factors justified a departure from the $125 hourly limitation. The district court's award also included a fifteen percent multiplier of the attorney's fees, or $349,643.77, to compensate the Aisenbergs for "the delay in the receipt of payment."

The district court's award was based on a total of 11,251.70 attorney hours by ten attorneys in the law firm of Cohen, Jayson & Foster, P.A. in Tampa, Florida, and on rates varying from $150 to $400 per attorney. On appeal, the

---

[11]As noted in footnote 5, supra, the district court also published the magistrate judge's earlier report, dated February 14, 2001, which likewise made extensive findings about the county detectives' misconduct. Aisenberg, 247 F. Supp. 2d at 1324-57.

government does not contest the 11,251.70 hours awarded or $195,670.32 in litigation expenses. Instead, the government contends that the district court erred (1) in not following the $125 hourly cap applicable under the Hyde Amendment, and (2) in awarding $349,643.77 as a fifteen percent enhancement for delay in payment.

### E.    Grand Jury Transcripts

In the same January 31, 2003, order on attorney's fees, the district court ordered that the government must file and disclose all grand jury transcripts by February 10, 2003. The Aisenbergs initially requested the grand jury transcripts in 2000, and requested them again in 2002 to support their claim for attorney's fees. After acknowledging that the government opposed this disclosure, the district court explained that it had "deferred any ruling on the motions [for the transcripts] because Hyde Amendment liability was conceded by the United States," and thus discovery of the transcripts "appeared most likely unnecessary." Aisenberg, 247 F. Supp. 2d at 1322. The district court further noted that its award closes the attorney's fee issue. Id.

Nonetheless, the district court ordered wholesale disclosure of all grand jury transcripts primarily because the Aisenbergs persisted in their interest in them and the public has a "strong interest" in inspecting troubled prosecutions in Hyde

12

Amendment cases. Id. at 1323-24. Specifically, the district court reasoned that when a Hyde Amendment award is made out of "public funds to reimburse defendants victimized by a 'vexatious, frivolous, or bad faith' prosecution," the public has "a strong interest" in the events leading to that prosecution and "in inspecting these troubled prosecutions to determine the source of the United States' misdirection." Id. at 1323.

The district court also concluded that non-disclosure serves no remaining interest of the Aisenbergs because they already had been indicted, this fact was well known, and the Aisenbergs consent to the release. Id. As for the government's interest, the district court observed that the grand jury deliberations were completed, that the criminal investigation was at a standstill, and that this circumstance will persist indefinitely, creating what the court termed "only the most minimal and inconsequential countervailing considerations." Id. The district court determined that the Aisenbergs' and the public's interest was in disclosure and that "the only contrary interest remaining is that of the United States, which may want to avoid a full airing of the episode." Id. at 1323-24.

F.    Stay of Grand Jury Disclosure

After the district court ordered wholesale disclosure of all grand jury transcripts by February 10, 2003, the government filed a motion to stay the

immediate public disclosure pending appeal.[12]  The government emphasized that the Aisenbergs would not suffer injury from a stay because they had obtained a dismissal of the indictment against them and an unprecedented amount of attorney's fees under the Hyde Amendment without access to or any need for the grand jury materials.  The government also stressed that this serious crime remained unsolved and disclosure would interfere with its ongoing investigation.[13]

---

[12]In its stay motion, the government stressed that the Supreme Court has instructed that parties seeking grand jury materials "must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed. Such a showing must be made even when the grand jury whose transcripts are sought has concluded its operations . . . ."  See Douglas Oil Co. of Cal v. Petrol Stops Northwest, 441 U.S. 211, 222, 99 S. Ct. 1667, 1674 (1979); United Kingdom v. United States, 238 F.3d 1312, 1320-21 (11th Cir. 2001) (adopting Douglas Oil standard).  The government argued that the Aisenbergs had not met these three requirements and that the district court's order was not based on an identified particularized need for the transcripts, but rather on an alleged public interest in scrutinizing the activities of a misdirected investigation.

[13]In a January 4, 2002, hearing involving the intervenor media's request for the wiretap recordings and other records under seal, the government offered to present information in camera to the district court about its continuing investigation of Sabrina's disappearance and had witnesses available to do so, but the district court refused to hear the proffer.

However, in the context of the government's stay motion, the district court did offer to receive evidence in camera from the government about the viability of its ongoing investigation in order to evaluate whether disclosure would cause irreparable harm.  The government submitted a May 1, 2003, affidavit of an Assistant United States Attorney, assigned to the General Crimes Section of the Criminal Division in the Middle District of Florida, stating that "[t]he investigation is currently active and ongoing, and is being conducted with state and federal law enforcement officers," and disclosure "would compromise the ongoing investigation."  The government declined to present witnesses or further information in camera at the stay hearing on May 2, 2003.  The government asserted that a court evidentiary inquiry into whether a government investigation is viable would constitute an unwarranted judicial intrusion into prosecutorial functions delegated to another branch of government.  In this stay context, the government's position was that the record both in camera and in the public record already established sufficiently that the crime remained unsolved and that there was an ongoing criminal

14

In reply, the Aisenbergs objected to any stay and emphasized that they needed the grand jury material to support their civil lawsuit "against the lawyers and law enforcement personnel responsible for the bad faith, vexatious and frivolous prosecution of the Aisenbergs." See Aisenberg v. Hillsborough County Sheriff's Office, No. 8:03-CV-2063-7-23EAJ (M.D. Fla. 2003).[14] The Aisenbergs cited Federal Rule of Criminal Procedure 6(e)(3)(C)(i)(I), which permits disclosure of grand jury material "when so directed by a court preliminarily to or in connection with a judicial proceeding." Fed. R. Crim. P. 6(e)(3)(C)(i)(I) (2002).[15] The Aisenbergs further challenged the viability of any continuing

investigation.

[14]In their objection to the government's request for a stay, counsel for the Aisenbergs stated that they were "currently drafting a civil complaint." The Aisenbergs then filed their lawsuit in September 2003 in the state circuit court, before oral argument in this appeal. The Aisenbergs' civil lawsuit was subsequently removed to the United States District Court for the Middle District of Florida. Although the civil lawsuit was not filed at the time of the district court's disclosure order in January 2003, the Aisenbergs apparently all along wanted the grand jury transcripts not only for their attorney's fee claim in the criminal case, but also to sue the government civilly. Because both parties have briefed and argued whether the grand jury transcripts are discoverable under Rule 6(e)(3)(C)(i)(I) to aid the Aisenbergs' civil lawsuit, we consider that issue as well in this appeal.

[15]The Aisenbergs' objection to the government's stay motion also argued that disclosure would help them during their appellate litigation regarding the attorney's fees award. The Aisenbergs asserted that "[n]o doubt, the government will argue in the appellate court . . . that the governmental conduct at issue did not justify the award of fees . . . ." The government, however, has not made this argument on appeal, but rather has continued to concede that attorney's fees are owed under the Hyde Amendment. Thus, the Aisenbergs have not shown that they need the grand jury transcripts as to any attorney's fee issues under the Hyde Amendment.

15

criminal investigation[16] and asserted that much of the information presented before the grand jury was already public, leaving few, if any, justifications for non-disclosure.

On May 5, 2003, the district court entered an order rejecting the government's request for a stay pending appeal.[17] In that order, the court concluded, <u>inter alia</u>, that the government's "putative 'investigation' is entitled to no weight in the decision regarding the stay," and that "there is apparently no meaningful investigation to endanger." The district court stated that the Aisenbergs were prejudiced by the continued secrecy and that "their public exoneration and the pursuit of rights they assert against the United States are impaired by continuing non-disclosure."

The government then moved in this Court for a stay of disclosure of the grand jury transcripts pending appeal, which was granted on June 26, 2003.

## II. STANDARD OF REVIEW

On appeal, the government contests only (1) the amount of the attorney's fees awarded and (2) the district court's disclosure of all grand jury transcripts.

---

[16]At a February 5, 2003, hearing regarding the government's stay motion, the Aisenbergs' defense counsel questioned whether the government's investigation was sufficiently "active" because according to a news report, it was staffed by a single investigator.

[17]While the parties briefed the stay issue, the district court did enter a temporary stay, which was dissolved by the district court's May 5, 2003, order.

This Court reviews a district court's award or denial of Hyde Amendment attorney's fees and costs for abuse of discretion. United States v. Adkinson, 247 F.3d 1289, 1290 (11th Cir. 2001); United States v. Gilbert, 198 F.3d 1293, 1298 (11th Cir. 1999). "An abuse of discretion occurs if the judge fails to apply the proper legal standard or to follow proper procedures in making the determination, or bases an award [or a denial] upon findings of fact that are clearly erroneous." Id. (internal quotation marks and citation omitted) (alteration in original).

This Court reviews a district court's order granting disclosure of grand jury transcripts for an abuse of discretion. See United Kingdom v. United States, 238 F.3d 1312, 1319-21 (11th Cir. 2001).

## III. DISCUSSION

### A. The Language of the Hyde Amendment

"We begin our construction of the Hyde Amendment . . . with the words of the statutory provision themselves." Gilbert, 198 F.3d at 1298. The Hyde Amendment provides in pertinent part:

> [T]he court, in any criminal case (other than a case in which the defendant is represented by assigned counsel paid for by the public) . . . may award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust. Such awards shall be granted pursuant to the

17

> procedures and limitations (but not the burden of proof) provided for an award under section 2412 of title 28, United States Code.

Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes) (emphasis added).

This circuit's prior Hyde Amendment decisions have dealt primarily with whether the prevailing federal criminal defendant carried his burden to show the required prerequisite to a fee award, to wit: that the United States' position was "vexatious, frivolous, or in bad faith." See Adkinson, 247 F.3d at 1293; Gilbert, 198 F.3d at 1297. In this case, however, the government conceded the applicability of the Hyde Amendment in the district court and that the Aisenbergs are entitled to recover their attorney's fees and expenses. This appeal requires us to determine only issues relating to the amount of the attorney's fees owed. Those issues are:

(1)     whether the Hyde Amendment incorporates the procedures and limitations in § 2412(d), making the $125 hourly limitation in § 2412(d)(2)(A)(ii) applicable to all Hyde Amendment claims, or whether the Hyde Amendment also incorporates the other avenues of relief contained in § 2412(b);

(2)     whether special factors exist justifying a departure from the $125

hourly limitation on attorney's fees provided in § 2412(d)(2)(A)(ii); and

(3) whether a district court may increase a Hyde Amendment award by a multiplier for a delay in payment.

The parties acknowledge that the Hyde Amendment provides that fee awards "shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under section 2412" of the Equal Access to Justice Act ("EAJA"). Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes). The parties' dispute is over how we should construe the Hyde Amendment's language of "procedures and limitations . . . provided for an award under § 2412." Thus, at the outset we also must examine what "procedures and limitations" are provided for an award under § 2412.

Section 2412 of the EAJA contains two separate subsections relating to attorney's fees: § 2412(b) and § 2412(d). Of these, only § 2412(d) contains any procedures and limitations for an award of attorney's fees under the EAJA. Specifically, § 2412(d) states: (1) that a party must file for an award of attorney's fees within thirty days of final judgment, § 2412(d)(1)(B); (2) that "attorney fees shall not be awarded in excess of $125 per hour unless the court determines

19

that . . . a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee," § 2412(d)(2)(A)(ii); and (3) that an individual may not recover attorney's fees if his net worth exceeds $2,000,000 at the time the civil action was filed, nor may the owner of a business whose net worth exceeds $7,000,000 and had more than 500 employees at the time the civil action was filed, § 2412(d)(2)(B).[18]

To date, all circuits to consider this issue have concluded that the procedures and limitations in § 2412 incorporated by the Hyde Amendment are the procedures and limitations in § 2412(d). See United States v. Knott, 256 F.3d 20, 26-27 (1st Cir. 2001) (holding net worth limitation of § 2412(d)(2)(B) applies to recovery under Hyde Amendment, and § 2412(b) does not provide avenue for recovery under Hyde Amendment); United States v. Sherburne, 249 F.3d 1121, 1129 (9th Cir. 2001) (holding cap on attorney's fees provided in § 2412(d)(2)(A)(ii) applies to recovery under Hyde Amendment); United States v. Ranger Elec. Communications, Inc., 210 F.3d 627, 633 (6th Cir. 2000) (holding

---

[18]Section 2412(d) also contains this burden of proof: the United States must show that its position was "substantially justified or that special circumstances make an award unjust," when defending an application for attorney's fees. § 2412(d)(1)(A). However, this burden of proof is specifically excepted from the Hyde Amendment, which limits the recovery of attorney's fees to the "procedures and limitations (but not the burden of proof)" of § 2412. Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes). This reference to burden of proof is further evidence that the language of the Hyde Amendment is directed at incorporating the procedures and limitations of § 2412(d).

thirty-day limitation for filing award for attorney's fees provided in § 2412(d)(1)(B) applies to Hyde Amendment application). We now join those circuits.[19]

We recognize that the Aisenbergs contend that their fee award under the Hyde Amendment is governed by § 2412(b), not § 2412(d). We reject this argument for several reasons.

First, the plain language of the Hyde Amendment limits awards to "the procedures and limitations (but not the burden of proof) provided for an award under section 2412." Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes). Section 2412(d) provides procedures and limitations to fee awards under the EAJA, but § 2412(b) provides none. Ranger, 210 F.3d at 634 (noting that § 2412(b) "provides neither procedural guidance nor eligibility limitations") (Jones, J., concurring). Thus, "allowing defendants to elect to proceed under § 2412(b) would effectively read the clause 'under the procedures and limitations of section 2412' out of the Hyde

---

[19]See also United States v. Truesdale, 211 F.3d 898, 907 (5th Cir. 2000) (noting that government's reading of Hyde Amendment as incorporating the procedures and limitations in § 2412(d) "seems reasonable" but ultimately not deciding the issue). Although the Fourth Circuit has not yet ruled on this issue, a district court in United States v. Holland, 34 F. Supp. 2d 346 (E.D. Va. 1999), concluded that a prevailing defendant may choose to recover an award of attorney's fees under the Hyde Amendment through either § 2412(b) or § 2412(d). Id. at 359, vacated in part on other grounds on reconsideration, 48 F. Supp. 2d 571 (E.D.Va. May 18, 1999), aff'd on other grounds, 214 F.3d 523 (4th Cir. 2000).

21

Amendment." Knott, 256 F.3d at 27.

As the First Circuit also aptly recognized in Knott, any reading of the Hyde Amendment not incorporating the procedures and limitations of § 2412(d):

> undercuts the language of the provision and policy concerns underlying the incorporation of these procedures and limitations. If defendants could elect to proceed under § 2412(b), . . . it is not clear that the Hyde Amendment's incorporation of 'procedures and limitations' from the EAJA would have any practical effect. In order to give meaningful effect to the plain language of the Hyde Amendment, then, the incorporation is best read to refer to the limitations contained in EAJA § 2412(d).

Id. at 27; see also Ranger, 210 F.3d at 633 (noting that a construction of the Hyde Amendment that does not apply § 2412(d) "does not give effect to the plain meaning of the Hyde Amendment nor the policy considerations behind it"); Sherburne, 249 F.3d at 1129 (stating in relation to the award of attorney's fees under the Hyde Amendment that "[t]he statute is explicit - the limitations of the EAJA apply. The EAJA caps attorney's fees at $125 per hour").

Second, because § 2412(d) of the EAJA supplies an independent, substantive ground upon which a civil litigant may recover fees under the EAJA, its sole incorporation comports with the plain meaning of the Hyde Amendment. The plain language of the Hyde Amendment refers to "procedures and limitations . . . provided for an award under section 2412." Pub. L. No. 105-119,

22

§ 617, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes) (emphasis added). This language supports the exclusive incorporation of § 2412(d) because § 2412(d) alone provides a self-contained, substantive means for recovering attorney's fees. Specifically, § 2412(d) provides that "a court shall award to a prevailing party . . . fees and other expenses, . . . unless the court finds that the position of the United States was substantially justified." 28 U.S.C. § 2412(d)(1)(A).

In contrast to § 2412(d), § 2412(b) does not provide a substantive or independent basis for an attorney's fee award under § 2412 but acts as only a waiver of sovereign immunity when the common law or another statute provides for an attorney's fee award. Specifically, § 2412(b) provides that "[t]he United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award." 28 U.S.C. § 2412(b). Furthermore, as expressed by the First Circuit in United States v. Knott, "it would create a peculiar circularity to allow a defendant relying on the Hyde Amendment as the substantive basis of a request for attorneys' fees to elect to proceed through EAJA § 2412(b) in order to avoid the limitations imposed in EAJA § 2412(d), given that the Hyde Amendment itself incorporates the procedures and limitations

of the EAJA." 256 F.3d at 27; <u>Ranger</u>, 210 F.3d at 633 (stating that "it would be circular to go back to the Hyde Amendment to treat it as an independent statute giving the right to attorneys' fees without the thirty-day limitation").[20]

Third, the established principle that waivers of sovereign immunity are to be construed narrowly counsels our construction of the Hyde Amendment. <u>Lane v. Pena</u>, 518 U.S. 187, 192, 116 S. Ct. 2092, 2096 (1996) (stating that a waiver of sovereign immunity "must be unequivocally expressed in statutory text," and "will be strictly construed . . . in favor of the sovereign") (citations omitted); <u>Maritime Mgmt., Inc. v. United States</u>, 242 F.3d 1326, 1336 (11th Cir. 2001) (noting that "the EAJA is a waiver of sovereign immunity and as such must be strictly construed"). This principle adds further support for the incorporation of the

_____

[20]This is the first time in which this Court directly has addressed the question of whether a Hyde Amendment applicant can avoid § 2412(d) and proceed under § 2412(b). We note, however, that in <u>United States v. Adkinson</u>, 247 F.3d 1289 (11th Cir. 2001), this Court indicated in footnote two that "[w]e recognize that recovery under the Hyde Amendment is allowed under only limited circumstances, and is subject to the restrictions and procedures articulated by the language of the law and its legislative history." <u>Id.</u> at 1291 n.2. As examples of those limitations, the <u>Adkinson</u> Court then listed the requirement that an individual's "net worth was less than two million dollars," citing § 2412(d). <u>Id</u>. Accordingly, <u>Adkinson</u> already reflects an understanding that the "procedures and limitations" of § 2412 referenced in the Hyde Amendment are those found in § 2412(d). However, the issue in <u>Adkinson</u> was whether the factual circumstances in <u>Adkinson</u> demonstrated bad faith, and the <u>Adkinson</u> court remanded the case to the district court "for a determination of the amount of fees and expenses" the defendants were entitled to under the Hyde Amendment. <u>Id.</u> at 1293. On remand, the district court in <u>Adkinson</u> concluded, as we do here, that § 2412(d)(2)(A)(ii)'s $125 hourly cap is incorporated by the Hyde Amendment and applied the fee cap. <u>United States v. Adkinson</u>, 256 F. Supp. 2d 1297, 1308-11 (N.D. Fla. 2003). This order is now on appeal with the Eleventh Circuit. <u>Adkinson v. United States</u>, No. 03-11104 (11th Cir. argued Jan. 15, 2004).

24

procedures and limitations of § 2412(d) in awarding attorney's fees under the Hyde Amendment.  Knott, 256 F.3d at 27; Ranger, 210 F.3d at 633.

Fourth, although unnecessary to our review,[21] the legislative history of the Hyde Amendment provides support for our construction of the Hyde Amendment. In United States v. Gilbert, this Court reviewed the legislative history of the Hyde Amendment.  198 F.3d at 1299-1303.  In its original form, the Hyde Amendment was patterned after 28 U.S.C. § 2412(d)(1)(A).[22]  Id. at 1300; Ranger, 210 F.3d at 634 (Jones, J. concurring).  After forceful criticism from members of Congress and the Executive Branch due in part to the relatively low standard permitting recovery, the Hyde Amendment's language was modified, narrowing the grounds for recovery.  Gilbert, 198 F.3d at 1300-03.  The adopted version of the Hyde Amendment disavowed the burden of proof on the government contained in § 2412(d)(1)(A), required that the prevailing criminal defendant carry the burden of proof, and further narrowed the standard of recovery to those cases in which

_____

[21]"Given the plain meaning of the statutory language, we could bypass any consideration of legislative history."  Gilbert, 198 F.3d at 1299.

[22]Representative Hyde's comments when initially offering the Amendment also indicate that the Hyde Amendment was patterned after § 2412(d).  Representative Hyde stated, when describing recovery under the Hyde Amendment, that, "if it was an abuse of process, if it was frivolous, if it was malicious, then the victim, the defendant who has prevailed, is entitled to attorney's fees, very modest, $125 an hour."  143 Cong. Rec. H7791 (daily ed. Sept. 24, 1997) (statement of Rep. Hyde).

25

"the position of the United States was vexatious, frivolous, or in bad faith." Id. at 1302 (citing Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes)).

Thus, as detailed in Gilbert, the Hyde Amendment was initially patterned after § 2412(d), and the language was modified only in an effort to narrow the grounds of recovery and not, as the Aisenbergs suggest, to broaden the sections under § 2412 in which Hyde Amendment applicants may recover. Thus, construing the Hyde Amendment to provide a narrow ground of recovery by incorporating the procedures and limitations of § 2412(d) is consistent not only with the principle of narrowly construing waivers of sovereign immunity, but also with the legislative history of the Hyde Amendment.

For all of these reasons and consistent with all other circuits that have addressed the issue, we hold that the Hyde Amendment incorporates all of the procedures and limitations in § 2412(d) and does not incorporate § 2412(b). Thus, the district court erred in concluding that the Aisenbergs could proceed under § 2412(b) and avoid the $125 hourly limitation in § 2412(d)(2)(A)(ii).

B.    Special Factors Removing $125 Fee Cap

The district court alternatively concluded that even if § 2412(d) applied, special factors existed justifying a departure from the $125 hourly limitation in

26

§ 2412(d)(2)(A)(ii). Specifically, § 2412(d)(2)(A)(ii) provides that "attorney fees shall not be awarded in excess of $125 per hour unless a court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A)(ii). The district court relied on two special factors: (1) the government's concession that an attorney's fees award was appropriate under the Hyde Amendment; and (2) its finding that the government's prosecution of the Aisenbergs was vexatious and in bad faith. In addition to those two factors, the Aisenbergs rely on two more factors, which are: (3) the delay caused by the government litigating meritless positions; and (4) the limited availability of qualified attorneys.[23]

Much of the EAJA case law defines "special factor" in § 2412(d)(2)(A)(ii) of the EAJA by what it is not. In Pierce v. Underwood, 487 U.S. 552, 573, 108 S. Ct. 2541, 2554 (1988), the Supreme Court stated that special factors in the context of § 2412(d)(2)(A)(ii) do not include "[t]he novelty and difficulty of issues, the undesirability of the case, the work and ability of counsel, and the results

_____

[23]Both the district court and the government agree that the "cost of living" exception in § 2412(d)(2)(A)(ii) is not applicable here. In its January 31, 2003, order, the district court stated that "[n]o marked increase in the cost of living has occurred since 1998." Aisenberg, 247 F. Supp. 2d at 1304. The Aisenbergs do not assert on appeal that an increase in the cost of living requires a departure from the $125 hourly cap in § 2412(d)(2)(A)(ii), but rather contend that the above four special factors justify exceeding the $125 hourly cap.

obtained," nor "factors applicable to a broad spectrum of litigation" including "the contingent nature of the fee." Id. (internal quotation marks omitted). Similarly, in Pollgreen v. Morris, 911 F.2d 527, 537 (11th Cir. 1990), this Court noted that special factors in the context of § 2412(d)(2)(A)(ii) do not include "the motivations of the attorneys in bringing the case, the pro bono nature of the case, the fact that the litigation served to 'vindicate public rights,' and the hardships experienced by counsel in departing from the statutory hourly rate." Id. (citing Jean v. Nelson, 863 F.2d 759, 775-76 (11th Cir. 1988)).[24] This Court in Pollgreen further stated that "[a] delay that occurred because the government litigated a position that lacked substantial justification is not a permissible special factor

---

[24]We recognize that the Aisenbergs rely on Jean v. Nelson, 863 F.2d 759 (11th Cir. 1988), where this Court stated in footnote thirteen that "an improper purpose can be a factor that is additional to a 'frivolous' position," and further explained that "if the government in this case advanced litigation for any improper purpose such as harassment, unnecessary delay or increase in the plaintiffs' expense, then consistent with Pierce, its action warrants the imposition of a special factor." 863 F.2d at 776 n.13; Pollgreen, 911 F.2d at 537-38 (stating that "[t]he government's delay in litigating a case is a permissible special factor only when the motivation for the delay was improper or the length of the delay itself was inappropriate. . . . If the government's litigation delay was the result of bad faith or the length of the delay was excessive, regardless of the merits of the position litigated, then such a delay could constitute a special factor").

The government correctly points out, however, that Jean v. Nelson involved an application for attorney's fees under the EAJA where fees are awarded when the government's position was not substantially justified. 863 F.2d at 777 (citing 28 U.S.C. § 2412(d)(1)(A)). Under this lower standard, a case involving a vexatious or bad faith prosecution is an exception. The same cannot be said of an application under the Hyde Amendment, which, by definition, must have involved vexatious or bad faith litigation. Thus, we conclude that the rationale in footnote thirteen of Jean does not apply in the Hyde Amendment context, and we decline to extend Jean.

because any litigation eligible for EAJA fees, by definition, involves the government's pursuit of an unjustified position." 911 F.2d at 538.

Turning to the special factors asserted by the Aisenbergs, we first conclude that the government's concession that the Hyde Amendment applied does not supply a special factor warranting a fee cap departure. Neither the unprecedented nature of the concession, nor the magnitude of the underlying error that the concession impliedly suggests, can be a special factor. As the government points out, finding otherwise would create perverse incentives that discourage useful settlements and encourage protracted litigation. See Pierce, 487 U.S. at 568, 108 S. Ct. at 2552 (1988) (observing, in award of attorney's fees under EAJA § 2412(d), that government's willingness to settle as proof that its position was not substantially justified "would not only distort the truth but penalize and thereby discourage useful settlements"); Hensley v. Eckerhart, 461 U.S. 424, 437, 103 S. Ct. 1933, 1941 (1983) (stating that "[a] request for attorney's fees should not result in a second major litigation").

Similarly, the district court's independent finding in its attorney's fees order that the government's position was vexatious, frivolous, or in bad faith, does not provide a special factor. The Hyde Amendment requires that all successful applicants show that the government's position was vexatious, frivolous, or in bad

29

faith. As such, a district court's determination that the government's prosecution was vexatious, frivolous, or in bad faith does not justify a fee cap departure because every successful application under the Hyde Amendment would then be subject to a fee cap departure.[25]

The Aisenbergs also emphasize the delay between the Aisenbergs' fee application in March 2001 and ultimate recovery of fees in 2003. In Pollgreen, this Court held that the "government's delay in litigating a case is a permissible special factor only when the motivation for the delay was improper or the length of the delay itself was inappropriate." 911 F.2d at 537. The government's litigation over the amount of attorney's fees due, after conceding liability, does not constitute the special factor of improper purpose. Specifically, the government's position that § 2412(d)(2)(A)(ii) limits attorney's fees to $125 per hour under the Hyde Amendment is supported by the statutory language, as well as other circuits' case law. As such, we conclude that the government's motivation for litigating the

---

[25]See Pollgreen, 911 F.2d at 538 (noting in an EAJA case that "[a] delay that occurred because the government litigated a position that lacked substantial justification is not a permissible special factor because any litigation eligible for EAJA fees, by definition, involves the government's pursuit of an unjustified position"); Jean, 863 F.2d at 782 (stating in an EAJA case that, "as a finding that the government's position had no 'reasonable basis both in law and fact' is a condition precedent to every EAJA award, allowing a premium based on the government's 'contentions and litigating postures' will likely lead courts to double-count the substantial-justification factor") (Kravitch, J., concurring in part, dissenting in part).

amount of attorney's fees was not the result of an "improper purpose."[26]

Finally, the Aisenbergs argue on appeal that "the limited availability of qualified attorneys for the proceedings involved[] justifies a higher fee." See 28 U.S.C. § 2412(d)(2)(A)(ii). The district court made no such finding, and there is no evidence to support any such finding in this record. To the contrary, the record shows ten lawyers in Cohen, Jayson & Foster, P.A. in fact worked on this criminal case.

The Aisenbergs also claim that their lawyers incurred a substantial economic detriment in representing unpopular clients and in handling the complex legal, factual, and professional obstacles in this case. Although this practice is commendable, the Supreme Court and this Court already have addressed this issue under § 2412(d) and have held that such hardship does not qualify as a special factor. See Pierce, 487 U.S. at 573, 108 S. Ct. at 2554 (stating that special factors in the context of § 2412(d)(2)(A)(ii) do not include "[t]he 'novelty and difficulty of issues,' 'the undesirability of the case,' the 'work and ability of counsel,' and 'the results obtained'" nor "factors applicable to a broad spectrum of litigation," including "'the contingent nature of the fee'") (internal citations omitted);

---

[26]While the district court found that the government's motivation for the prosecution was improper, it did not find that there was any improper intent in litigating the amount of attorney's fees.

31

Pollgreen, 911 F.2d at 537 (stating that special factors in the context of § 2412(d)(2)(A)(ii) do not include "the motivations of the attorneys in bringing the case, the pro bono nature of the case, the fact that the litigation served to 'vindicate public rights,' and the hardships experienced by counsel in departing from the statutory hourly rate") (citation omitted).

In sum, we conclude that no special factors exist in this record to justify a departure from the $125 hourly limitation provided in § 2412(d)(2)(A)(ii), as incorporated by the Hyde Amendment. Thus, the district court abused its discretion in departing above that $125 hourly limitation.

As discussed earlier, the government does not contest on appeal the number of attorney hours or the litigation expenses of $195,670.32. Thus, when the $125 fee is applied to those 11,251.70 hours, the attorney's fee due is $1,298,980, plus litigation expenses of $195,670.32, for a total of $1,494,650.32 due the Aisenbergs.

### C. Enhancement for Delay in Payment

The district court also erred in applying a multiplier of 1.15 to the attorney's fees awarded based on the delay in the Aisenbergs' receiving reimbursement for their attorney's fees. Specifically, the district court concluded that "[t]he circumstances of the present action, which has persisted for over five years, justify

32

the application of a multiplier of 1.15 to the lodestar of $2,330,958.45 to compensate the Aisenbergs for the delay in reimbursement." Aisenberg, 247 F. Supp. 2d at 1321. This 1.15 multiplier added $349,643.77 to the fee award of $2,330,958.45, for a total of $2,680,602.22 in attorney's fees.

It is well established that "interest cannot be recovered in a suit against the Government in the absence of an express waiver of sovereign immunity from an award of interest." Library of Congress v. Shaw, 478 U.S. 310, 311, 106 S. Ct. 2957, 2960 (1986); Newton v. Capital Assur. Co., 245 F.3d 1306, 1309 (11th Cir. 2001) (stating that "'[i]n the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award'") (alteration in original) (quoting Shaw, 478 U.S. at 314, 106 S. Ct. at 2961). Moreover, the Supreme Court has admonished that compensation for delay and interest "share an identical function," that they both "are designed to compensate for the belated receipt of money," and that "the no-interest rule cannot be avoided simply by devising a new name for an old institution." Shaw, 478 U.S. at 321-22, 106 S. Ct. at 2965. Thus, an award of "compensation for delay" is equivalent to an award of interest. Id. at

321, 106 S. Ct. at 2965.[27]  Accordingly, we must view the district court's compensation for delay as effectively an award of interest.

Further, the Supreme Court has declined to find "the requisite waiver of immunity from interest in the statutory requirement of awarding 'reasonable' attorney's fees," and has "consistently . . . refused to impute an intent to waive immunity from interest into the ambiguous use of a particular word or phrase in a statute."  Shaw, 478 U.S. at 320, 106 S. Ct. at 2964.  The Supreme Court has instructed that "[a] statute allowing costs, and within that category, attorney's fees, does not provide the clear affirmative intent of Congress to waive the sovereign's immunity" to interest payments.  Id. at 321, 106 S. Ct. at 2965.

Nothing in the Hyde Amendment, nor the incorporated § 2412(d) of the EAJA, provides the required unequivocal waiver of immunity of the United States

---

[27]The district court relied on Missouri v. Jenkins, 491 U.S. 274, 282, 109 S. Ct. 2463, 2468 (1989), and Norman v. Housing Authority of Montgomery, 836 F.2d 1292, 1302 (11th Cir. 1988), but failed to observe that those two cases involved state defendants as opposed to the United States.  For example, in Jenkins, the defendant was a state and the Supreme Court held that the Eleventh Amendment did not prohibit enhancement of an attorney's fee award, ancillary to a grant of prospective relief, for a delay in payment.  491 U.S. at 284, 109 S. Ct. at 2469.  The Supreme Court in Jenkins, however, expressly distinguished its holding in that case from the holding of Library of Congress v. Shaw, 478 U.S. 310, 106 S. Ct. 2957 (1986), and stated that the "no-interest rule" applicable to the United States in Shaw was not at issue in Jenkins, and further that the "no-interest rule" provides an "'added gloss of strictness,' only where the United States' liability for interest is at issue."  Jenkins, 491 U.S. at 281 n.3, 109 S. Ct. 2468 n.3.  The Supreme Court also noted in Jenkins that Shaw's proscription of compensation for delay in payment does not apply generally, but rather in the specific context where the United States is liable and has not waived its sovereign immunity.  Id.

34

for the payment of interest or compensation for delay.[28]  Instead, the Hyde

Amendment provides for only "reasonable attorney's fee[s] and other litigation

expenses."  Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997) (reprinted in

18 U.S.C. § 3006A, historical and statutory notes).  Therefore, we conclude that

the district court also erred in enhancing the attorney's fee award by fifteen

percent, or $349,643.77, for the delay in payment of these fees.

## D.    General Grand Jury Principles

We now turn to the district court's wholesale disclosure of all grand jury

transcripts.  We first review the general principles governing the disclosure of

secret grand jury material and then apply them to this case.

"It has long been a policy of the law that grand jury proceedings be kept

secret. . . . The English rule of grand jury secrecy has been incorporated into our

federal common law and remains 'an integral part of our criminal justice system.'"

Blalock v. United States, 844 F.2d 1546, 1555 (11th Cir. 1988) (citing Douglas

---

[28]Section 2412(d)(2)(A)(ii) provides for an adjustment to the $125 hourly limitation based on "an increase in the cost of living."  28 U.S.C. § 2412(d)(2)(A)(ii).  In EAJA cases, circuit courts have concluded that this provision does not waive the government's sovereign immunity with respect to interest.  See, e.g., Sorenson v. Mink, 239 F.3d 1140, 1148 (9th Cir. 2001); Masonry Masters, Inc. v. Nelson, 105 F.3d 708, 712 (D.C. Cir. 1997); Marcus v. Shalala, 17 F.3d 1033, 1039 (7th Cir. 1994); Perales v. Casillas, 950 F.2d 1066, 1077 (5th Cir. 1992); Chiu v. United States, 948 F.2d 711, 721 (Fed. Cir. 1991).  Because the Hyde Amendment incorporates § 2412(d)(2)(A)(ii), these circuit decisions involving § 2412(d)(2)(A)(ii) in the EAJA context are persuasive.  We can locate, however, no circuit decision ruling on the interest issue under the Hyde Amendment.

Oil Co. of Cal. v. Petrol Stops Northwest, 441 U.S. 211, 218 n.9, 99 S. Ct. 1667, 1672 n.9 (1979)); see also United States v. Phillips, 843 F.2d 438, 441 (11th Cir. 1988) (stating that "[t]he secrecy of the grand jury is sacrosanct"). In Douglas Oil, the Supreme Court summarized the reasons for, and interests served by, grand jury secrecy as follows: (1) "if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony"; (2) "witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements"; (3) "[t]here . . . would be the risk that those about to be indicted would flee"; (4) there would be the risk that those about to be indicted "would try to influence individual grand jurors to vote against indictment"; (5) "by preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule." 441 U.S. at 219, 99 S. Ct. at 1673.

Rule 6(e) of the Federal Rules of Criminal Procedure codifies this secrecy principle and prohibits the disclosure of grand jury material except in the limited circumstances provided for in Rule 6(e)(3). The only Rule 6(e)(3) exception at issue here is in Rule 6(e)(3)(C)(i)(I), which permits disclosure of grand jury material "when so directed by a court preliminarily to or in conjunction with a

36

judicial proceeding."[29]  Fed. R. Civ. P. 6(e)(3)(C)(i)(I).

Although Rule 6(e)(3) enumerates the exceptions to the traditional rule of grand jury secrecy, the Supreme Court and this Court have recognized that the district courts have inherent power beyond the literal wording of Rule 6(e)(3) to disclose grand jury material and that Rule 6(e)(3) is but declaratory of that authority.  Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 398-99, 79 S. Ct. 1237, 1240-41 (1959); Petition to Inspect and Copy Grand Jury Materials, 735 F.2d 1261, 1268 (11th Cir. 1984) (hereinafter "Appeal of Hastings").[30] Nonetheless, we also have indicated that courts "are not empowered to act outside of Rule 6(e) in other than exceptional circumstances consonant with the rule's policy and spirit."  Appeal of Hastings, 735 F.2d at 1269; see id. at 1272.[31]  Thus,

---

[29]In 2002, Rule 6 of the Federal Rules of Criminal Procedure was amended as part of the general restyling of the Federal Rules of Criminal Procedure.  This exception to the secrecy of grand jury materials is now in Rule 6(e)(3)(E)(i) (2003).  Previously, this exception was found in Rule 6(e)(3)(C)(i)(I) (2002).  We need not decide which version applies because the language is essentially the same in either version.

[30]As we explained in Appeal of Hastings, "This is not to say the rule is not normally controlling.  It is.  But . . . the rule is not the true source of the district court's power with respect to grand jury records but rather is a codification of standards pertaining to the scope of the power entrusted to the discretion of the district court . . . ."  735 F.2d at 1268.  In Appeal of Hastings, this Court also noted that "the history of Rule 6(e) indicate[s] that the exceptions permitting disclosure were not intended to ossify the law, but rather are subject to development by the courts in conformance with the rule's general rule of secrecy."  Id. at 1269.

[31]In Appeal of Hastings, this Court amplified this principle as follows:
[C]ourts must adhere to Rule 6(e) in "garden variety" petitions for grand jury disclosure.  The rule was intended to provide a reliable statement of the law in this area, and would be rendered meaningless if departures were freely sanctioned.  We

37

while district courts have inherent authority to act outside Rule 6(e)(3), any inherent disclosure authority is exceedingly narrow and exists only in exceptional circumstances. See id. at 1272 (concluding that "a petition by a judicial investigating committee presents one of the occasions when a district court may act outside the strict boundaries of Rule 6(e)").[32]

The Aisenbergs seek to uphold the grand jury disclosure based both on the district court's inherent authority and on the exception in Rule 6(e)(3)(C)(i)(I). The guidelines for determining when grand jury secrecy may be broken are well settled and apply in both situations. Specifically, parties seeking disclosure must show:

(1)     "that the material they seek is needed to avoid a possible injustice in another judicial proceeding";

---

assume that courts are not empowered to act outside Rule 6(e) in other than exceptional cirucmstances consonant with the rule's policy and spirit.
Id. at 1269.

[32]Since Appeal of Hastings was decided, the United States Supreme Court in Carlisle v. United States, 517 U.S. 416, 116 S. Ct. 1460 (1996), stated that district courts lack "inherent supervisory power" to develop rules that circumvent or conflict with the Federal Rules of Criminal Procedure. Id. at 425-26, 116 S. Ct. at 1466. The government contends that the district court's disclosure decision conflicts with Rule 6(e) and is per se beyond the court's inherent authority. We need not decide this issue because, as explained later, the district court exceeds any inherent authority it has in any event.

(2)     "that the need for disclosure is greater than the need for continued

secrecy"; and,

(3)     "that their request is structured to cover only material so needed."

Douglas Oil Co., 441 U.S. at 222, 99 S. Ct. at 1674; United Kingdom v. United

States, 238 F.3d 1312, 1320-21 (11th Cir. 2001); United States v. Burke, 856 F.2d

1492, 1495-96 (11th Cir. 1988); United States v. Elliott, 849 F.2d 554, 557 (11th

Cir. 1988); Appeal of Hastings, 735 F.2d at 1273.

These same demanding standards apply even after the grand jury has

concluded its operations. Douglas Oil Co., 441 U.S. at 222, 99 S. Ct. at 1674

(stating that "[s]uch a showing must be made even when the grand jury whose

transcripts are sought has concluded its operations, as it had in Dennis [v. United

States, 384 U.S. 855, 86 S. Ct. 1840 (1966)]"); Elliott, 849 F.2d at 557 (same);

Burke, 856 F.2d at 1496 (same). "[I]n considering the effects of disclosure on

grand jury proceedings, the courts must consider not only the immediate effects

upon a particular grand jury, but also the possible effect upon the functioning of

future grand juries." Douglas Oil Co., 441 U.S. at 222, 99 S. Ct. at 1674.

Further, the burden of demonstrating that the need for disclosure outweighs

the need for, and public interest in, secrecy rests upon the private party seeking

disclosure. Id. at 223, 99 S. Ct. at 1675; United States v. Liuzzo, 739 F.2d 541,

39

545 (11th Cir. 1984). In order to carry this burden, the party seeking disclosure of grand jury material must show a compelling and particularized need for disclosure. United States v. Procter & Gamble Co., 356 U.S. 677, 682, 78 S. Ct. 983, 986 (1958) (stating that the "'indispensable secrecy of grand jury proceedings' must not be broken except where there is a compelling necessity," and that instances where the need outweighs the countervailing policy must "be shown with particularity") (internal citation omitted); United States v. Sells Eng'g, Inc., 463 U.S. 418, 443, 103 S. Ct. 3133, 3148 (1983) (stating that, "[w]e have consistently construed [Rule 6(e)(3)(C)(i)(I)] . . . to require a strong showing of particularized need for grand jury materials before any disclosure will be permitted"); United Kingdom v. United States, 238 F.3d at 1320-21; Cox v. Adm'r U.S. Steel & Carnegie, 17 F.3d 1386, 1421 (11th Cir. 1994); Burke, 856 F.2d at 1496; Elliott, 849 F.2d at 557; United States v. Cole, 755 F.2d 748, 758-59 (11th Cir. 1985); In re Grand Jury Proceedings, 613 F.2d 501, 506 (5th Cir. 1980); Allis-Chalmers Mfg. Co. v. City of Fort Pierce, 323 F.2d 233, 242 (5th Cir. 1963).[33]

---

[33]Our precedent in this area stems in part from Allis-Chalmers, where the Fifth Circuit held:

> that disclosure of grand jury testimony is properly granted where there is a compelling need for such disclosure and such disclosure is required by the ends of justice. Disclosure even in these circumstances must be closely confined to the limited portions of the testimony for which there is found to be a particularized need.

323 F.2d at 242. This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981).

To show a compelling and particularized need, the private party must show "'circumstances had created certain difficulties peculiar to this case, which could be alleviated by access to <u>specific</u> grand jury materials, without doing disproportionate harm to the salutary purpose of secrecy embodied in the grand jury process.'" <u>Elliott</u>, 849 F.2d at 558 (quoting <u>Liuzzo</u>, 739 F.2d at 545). As we stated in <u>Cox</u>, "'disclosure of grand jury testimony is properly granted where there is a compelling need for such disclosure and such disclosure is required by the ends of justice.'" <u>Cox</u>, 17 F.3d at 1421 (quoting <u>Allis-Chalmers</u>, 323 F.2d at 242).

Even when persons requesting disclosure have carried the burden of showing that they have a compelling and particular need for the grand jury material in order to avoid an injustice and that their need for disclosure outweighs the secrecy need, access is limited and covers only those materials actually needed. <u>Cox</u>, 17 F.3d at 1421 ("'<u>Disclosure even in these circumstances must be closely confined to the limited portions of the testimony for which there is found to be a particularized need.</u>'") (emphasis in original) (quoting <u>Allis-Chalmers</u>, 323 F.2d at 242); <u>In re Subpoena to Testify Directed to Custodian of Records</u>, 864 F.2d 1559, 1562 (11th Cir. 1989) (stating that "[e]ven when the person requesting such disclosure has shown a particularized need for the materials, access is limited and covers <u>only</u> those materials actually needed"); <u>Liuzzo</u>, 739 F.2d at 545 (noting that

41

when particularized need is shown, "access to grand jury materials must still be 'discrete[] and limited[],' and must be 'structured to cover only the material needed'") (alterations in original) (quoting Procter & Gamble, 356 U.S. at 683, 78 S. Ct. at 987, and Douglas Oil Co., 441 U.S. at 222, 99 S. Ct. at 1674). Accordingly, a "blanket request for all . . . grand jury materials . . . cannot be described as the kind of particularized request required for the production of otherwise secret information." United Kingdom v. United States, 238 F.3d at 1321.

Finally, the district court has "substantial discretion" in determining whether grand jury materials should be released. Douglas Oil Co., 441 U.S. at 223, 99 S. Ct. at 1675; see also Pittsburgh Plate Glass Co., 360 U.S. at 399, 79 S. Ct. at 1240 (1959); United Kingdom v. United States, 238 F.3d at 1320; Coronado v. BankAtlantic BanCorp, Inc., 222 F.3d 1315, 1322 (11th Cir. 2000). We now apply these principles to this case.

**E.     Grand Jury Transcripts in Aisenbergs' Case**

At the outset, we note that the district court did not rule on the Aisenbergs' requests for grand jury transcripts until its attorney's fees order of January 31, 2003. By this time, the indictment had been dismissed, the government had conceded that attorney's fees were due under the Hyde Amendment, and the

42

district court had determined the amount of those fees. The district court even acknowledged that it had deferred ruling on the Aisenbergs' grand jury request until after the fee award was made because liability was conceded and the grand jury discovery was most likely unnecessary. Aisenberg, 247 F. Supp. 2d at 1322. Nonetheless, the district court ordered disclosure. We conclude that the district court erred in ordering disclosure of all grand jury transcripts for several reasons.[34]

First, the district court's order relies heavily on the fact that Hyde Amendment attorney's fees have been awarded in this case and that public taxpayers must pay them. Based on these facts, the district court concluded that the public has a "strong interest" in inspecting this troubled prosecution through the Aisenbergs gaining access to the grand jury materials. Aisenberg, 247 F. Supp. 2d at 1323-24. Although acknowledging the Aisenbergs' burden to show entitlement to grand jury materials, the district court in effect used its Hyde Amendment award as the principal means to justify grand jury disclosure. The district court suggested in a footnote that "[p]erhaps an award under the Hyde

---

[34]The district court's attorney's fees order barely referred to Rule 6(e) and did not mention Rule 6(e)(3)(C)(i)(I) at all. Instead, the district court originally appeared to act under its inherent supervisory authority. In its subsequent stay order, however, the district court did mention Rule 6(e) and that the Aisenbergs' "pursuit of rights they assert against the United States are impaired by continuing non-disclosure." This appears to reference the Aisenbergs' civil lawsuit against the government. The Aisenbergs seek to uphold the disclosure under both Rule 6(e)(3)(C)(i)(I) and the district court's inherent authority. Thus, we have considered both grounds in reaching our conclusion in this case.

Amendment ought to tilt decisively the balance of considerations under Rule 6(e) . . . to the extent that public disclosure of grand jury proceedings is the presumptive consequence absent some persuasive reason for non-disclosure of all or part of the grand jury transcript." Aisenberg, 247 F. Supp. 2d at 1324 n.34. In essence, this shifts the burden to the government in Hyde Amendment cases to show a compelling and particularized need for non-disclosure of grand jury transcripts, as opposed to the Aisenbergs having the burden to show such a need for disclosure.

We decline to carve out new rules for Hyde Amendment cases. Nothing in the Hyde Amendment itself modifies the above well-established legal standards for discovery of sealed grand jury materials. See Gilbert, 198 F.3d at 1304-05 (addressing failure to introduce exculpatory evidence before the grand jury and stating that "[n]othing in the text or legislative history of the Hyde Amendment indicates that Congress intended to modify the law relating to discovery in criminal cases, to expand the Brady doctrine, or to categorize as prosecutorial misconduct actions which clearly were not misconduct under existing law"). If anything, the Hyde Amendment furthers the protection of grand jury secrecy. Specifically, the Hyde Amendment allows the government to defend itself against Hyde Amendment motions and protect confidential information by submitting

certain evidence ex parte, in camera, and under seal, such as the names of confidential informants and evidence of matters occurring before the grand jury. Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes); see United States v. Truesdale, 211 F.3d at 907 (stating that "the provision [in the Hyde Amendment] for in camera review of evidence was included to enable the government to defend itself against Hyde Amendment motions and at the same time protect confidential information").

Second, to the extent that the district court properly left the burden on the Aisenbergs, the district court abused its discretion by failing to follow the well-established and demanding legal standards regarding what the Aisenbergs must show to be entitled to secret grand jury material. As outlined above, whether relying on the court's inherent authority or Rule 6(e)(3)(C)(i)(I), the Aisenbergs have the burden to show: (1) "that the material they seek is needed to avoid a possible injustice in another proceeding"; (2) "that the need for disclosure is greater than the need for continued secrecy"; and (3) "that [the Aisenbergs'] request is structured to cover only material so needed." Douglas Oil Co., 441 U.S. at 222, 99 S. Ct. at 1674. The Aisenbergs did not satisfy any of these three prongs, and the district court erred in not requiring them to do so.

For example, the Aisenbergs have not shown a compelling and

particularized need for any portions of the grand jury transcripts for their civil lawsuit. Instead, the Aisenbergs already have a wealth of evidence about the government's conduct.[35] Indeed, the overwhelming nature of this evidence apparently led even the government to move to dismiss the indictment and to concede that attorney's fees were owed under the Hyde Amendment.[36]

Third, the district court also erred in concluding that the government's

---

[35]Due to the government's voluntary disclosure, the magistrate judge's discovery orders, or their own investigation, the Aisenbergs already have the following evidence: (1) the wiretap application and extension requests; (2) the wiretap tapes; (3) the handwritten transcripts of those tapes upon which the county detectives relied; (4) the government's transcripts of those tapes, including the FBI's work notes; (5) all written and recorded statements of the Aisenbergs, including excerpts of investigative reports containing the substance of their statements, their polygraph exams, and their grand jury testimony; (6) testimony of forty witnesses during the Franks hearing; (7) voluminous exhibits from the Franks hearing, including videotapes and photographs of Sabrina at the November 23, 1997, birthday party, summaries of the county detectives' interviews, and a doctor's report relied on by county detectives; (8) statements given to law enforcement by family, friends, and neighbors; (9) the state special prosecutor's report outlining "substantial errors" by county law enforcement and his investigative file, including approximately 3,000 documents from the state attorney's office and the United States Attorney's office; (10) affidavits by attendees of the November 23, 1997, birthday party indicating that Sabrina was content and did not have bruises nor missing hair; (11) sworn statements of the Aisenbergs' babysitter and friends indicating that Sabrina was in good condition without missing hair or bruises days before the missing child report; (12) police interviews and sworn statements by a hair stylist shop's employees indicating Sabrina's condition and, in some instances, noting misstatements in the police reports; (13) a forensic audio specialist's affidavit opining that the wiretap tapes did not contain the word "cocaine" nor the phrase "I wish I hadn't harmed her;" (14) a doctor's affidavit stating that the photographs of Sabrina at the November 23, 1997, birthday party do not indicate inflicted injuries; and (15) a witness' affidavit describing questions asked of her before the grand jury.

[36]In its January 31, 2003, order, the district court stated: "For reasons conspicuous in the record of this extraordinary case, the United States of America concedes liability – apparently the only such concession by the Department of Justice since enactment of the Hyde Amendment – for a prosecution that was either 'vexatious, frivolous, or in bad faith' within the meaning of the Hyde Amendment." Aisenberg, 247 F. Supp. 2d at 1275.

46

interest in grand jury secrecy was "minimal" (in its attorney's fees order) and constituted "no interest" (in its stay order), and that the government's only interest was "to avoid a full airing of the episode." Aisenberg, 247 F. Supp. 2d at 1324. Although the prior grand jury's deliberations are concluded, this case involves an unsolved, serious crime – the mysterious disappearance of a five-month old child from a private home with no forced entry. Even if the government's investigation is, as the district court aptly said, "essentially at a standstill," id., the government still has a substantial interest in keeping the grand jury material secret until this serious crime is solved and while its investigation continues. Release of grand jury transcripts will tell the perpetrator precisely what the government has and what it lacks. Even if, as the Aisenbergs argue, much of this information is already public through other means, release of the sealed grand jury materials will give the perpetrator a virtual roadmap to evade detection and capture.

In addition, future prospective witnesses would be hesitant to come forward and would be less likely to testify fully and frankly, knowing that the prior grand jury testimony about this same missing child has been made public. Those witnesses would anticipate that those against whom they testify may similarly later be made aware of their testimony. As the Supreme Court has explained, "in considering the effects of disclosure on grand jury proceedings, the courts must

47

consider not only the immediate effects upon a particular grand jury, but also the possible effect upon the functioning of future grand juries." Douglas Oil Co., 441 U.S. at 222, 99 S. Ct. at 1674. The Supreme Court further instructed that "[p]ersons called upon to testify will consider the likelihood that their testimony may one day be disclosed to outside parties," and because "[f]ear of future retribution or social stigma may act as powerful deterrents to those who would come forward and aid the grand jury in the performance of its duties," "the interests in grand jury secrecy, although reduced, are not eliminated merely because the grand jury has ended its activities." Id. The government, as well as the public and the Aisenbergs, have a strong interest in solving this serious, missing child crime, in future witnesses not being reluctant to testify about this crime before the grand jury, and thus in the secrecy of the grand jury not being broken. The unique circumstances of this case strongly counsel in favor of grand jury secrecy in the interest of solving this serious crime.

Fourth, and most importantly, we agree with the district court that the public and the Aisenbergs have a strong interest in any bad faith prosecution being fully exposed. We also agree that the insulation of such prosecutions forms no part of the justification for grand jury secrecy. However, the conduct in this prosecution already has been publicly aired at great length not only in extensive hearings

48

before the magistrate judge and district court, but also by the comprehensive orders and reports entered by the magistrate judge, the district court, and the state special prosecutor. Those orders and reports exhaustively examine the evidence of the government's conduct and elucidate in great detail the troublesome events in this case. Further, as recounted above, the Aisenbergs already have a wealth of evidence exposing the government's conduct in this case. Given that the government's conduct already has been revealed and publicly aired, the district court erred in concluding that the grand jury transcripts must be disclosed so that the public can know about this misdirected prosecution. The public already knows.

For all these reasons, the district court erred in ordering disclosure of the grand jury transcripts.

## IV. CONCLUSION

We reverse and vacate the district court's January 31, 2003, order to the extent it granted the Aisenbergs' $2,680,602.22 in attorney's fees. On remand, the district court shall enter judgment in favor of the Aisenbergs for $1,298,980.00 in attorney's fees, plus litigation expenses of $195,670.32, for a total of $1,494,650.32. We also reverse and vacate the district court's January 31, 2003, order to the extent it granted the Aisenbergs' motion for release of the grand jury

transcripts in issue and order that these grand jury transcripts shall remain sealed.

**REVERSED** and **VACATED IN PART; REMANDED.**